## UNITED STATES *v.* JOSEPH.

A. settled upon land belonging to the Indians of the village or pueblo of Taos, in New Mexico   *Held,* 1. That he was not liable under the acts of Congress which prohibit a settlement by any person on land belonging, secured, or granted by treaty with the United States, to any Indian tribe. 2. That they have a complete title to their land, and are not an Indian tribe within the meaning of those acts.

ERROR to the Supreme Court of the Territory of New Mexico.

*Mr. Solicitor Phillips* for the United States.
*Mr. S. B. Elkins, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

Sect. 2118 of the Revised Statutes, which was originally

enacted June 30, 1834, declares that every person who makes a settlement on any lands belonging, secured, or granted by treaty with the United States to any Indian tribe, or surveys or attempts to survey said lands, or to designate any of the boundaries by marking trees or otherwise, is liable to a penalty of $1,000. By sect. 7 of the act of July 27, 1851, it was enacted " that all laws now in force regulating trade and intercourse with the Indian tribes, or such provisions of the same as may be applicable, shall be, and the same are hereby, extended over the Indian tribes in the Territories of New Mexico and Utah."

The case before us was an action brought by the United States in the proper court in the Territory of New Mexico, to recover the penalty denounced in the section above recited. The petition alleges that defendant " did make a settlement in, and now occupies and is settled on, lands of the pueblo tribe of Indians of the pueblo of Taos, in the county of Taos, to wit, ten acres of land (describing its boundaries), by then and there building houses and making fields thereon. . . . Said lands then and there, and at the time of bringing this suit, belonging to said pueblo tribe of Indians of the pueblo of Taos aforesaid, and secured to said pueblo tribe of Indians of the pueblo of Taos aforesaid, by patent from the United States."

A demurrer to this petition was sustained in the Supreme Court of the Territory, and we are called on to decide whether it was rightfully sustained.

Were the pueblo Indians, and the lands held by them, on which this settlement was made, within the meaning of the act of Congress of 1834, and its extension to the Territory of New Mexico, by the act of 1851? This question resolves itself into two other : —

1. Are the people who constitute the pueblo or village of Taos an Indian tribe within the meaning of the statute?

2. Do they hold the lands on which the settlement mentioned in the petition was made by a tenure which brings them within its terms?

The first question is not concluded even on demurrer, because the petition calls them " the pueblo tribe of Indians of the pueblo of Taos ; " for if these people, with others of the

same character, are a well-known class, whose history, domestic habits, and relations to the government are matters of public notoriety, the court, being informed who they are by the description of them in the petition, as " pueblo Indians of the pueblo of Taos," is not bound by the use of the additional word " tribe " to disregard that knowledge, and assume that they are tribal Indians within the meaning of the statute regulating the intercourse of the white man with this latter class of Indians.

The character and history of these people are not obscure, but occupy a well-known page in the story of Mexico, from the conquest of the country by Cortez to the cession of this part of it to the United States by the treaty of Guadaloupe Hidalgo. The subject is tempting and full of interest, but we have only space for a few well-considered sentences of the opinion of the chief justice of the court whose judgment we are reviewing.

" For centuries," he says, " the pueblo Indians have lived in villages, in fixed communities, each having its own municipal or local government. As far as their history can be traced, they have been a pastoral and agricultural people, raising flocks and cultivating the soil. Since the introduction of the Spanish Catholic missionary into the country, they have adopted mainly not only the Spanish language, but the religion of a Christian church. In every pueblo is erected a church, dedicated to the worship of God, according to the form of the Roman Catholic religion, and in nearly all is to be found a priest of this church, who is recognized as their spiritual guide and adviser. They manufacture nearly all of their blankets, clothing, agricultural and culinary implements, &c. Integrity and virtue among them is fostered and encouraged. They are as intelligent as most nations or people deprived of means or facilities for education. Their names, their customs, their habits, are similar to those of the people in whose midst they reside, or in the midst of whom their pueblos are situated. The criminal records of the courts of the Territory scarcely contain the name of a pueblo Indian. In short, they are a peaceable, industrious, intelligent, honest, and virtuous people. They are Indians only in feature, complexion, and a few of their habits; in all other respects superior to all but a few of the civilized Indian

tribes of the country, and the equal of the most civilized thereof. This description of the pueblo Indians, I think, will be deemed by all who know them as faithful and true in all respects. Such was their character at the time of the acquisition of New Mexico by the United States ; such is their character now."

At the time the act of 1834 was passed there were no such Indians as these in the United States, unless it be one or two reservations or tribes, such as the Senecas or Oneidas of New York, to whom, it is clear, the eleventh section of the statute could have no application. When it became necessary to extend the laws regulating. intercourse with the Indians over our new acquisitions from Mexico, there was ample room for the exercise of those laws among the nomadic Apaches, Comanches, Navajoes, and other tribes whose incapacity for self-government required both for themselves and for the citizens of the country this guardian care of the general government.

The pueblo Indians, if, indeed, they can be called Indians, had nothing in common with this class. The degree of civilization which they had attained centuries before, their willing submission to all the laws of the Mexican government, the full recognition by that government of all their civil rights, including that of voting and holding office, and their absorption into the general mass of the population (except that they held their lands in common), all forbid the idea that they should be classed with the Indian tribes for whom the intercourse acts were made, or that in the intent of the act of 1851 its provisions were applicable to them. The tribes for whom the act of 1834 was made were those semi-independent tribes whom our government has always recognized as exempt from our laws, whether within or without the limits of an organized State or Territory, and, in regard to their domestic government, left to their own rules and traditions; in whom we have recognized the capacity to make treaties, and with whom the governments, state and national, deal, with a few exceptions only, in their national or tribal character, and not as individuals.

If the pueblo Indians differ from the other inhabitants of New Mexico in holding lands in common, and in a certain patriarchal form of domestic life, they only resemble in this

regard the Shakers and other communistic societies in this country, and cannot for that reason be classed with the Indian tribes of whom we have been speaking.

We have been urged by counsel, in view of these considerations, to declare that they are citizens of the United States and of New Mexico. But abiding by the rule which we think ought always to govern this court, to decide nothing beyond what is necessary to the judgment we are to render, we leave that question until it shall be made in some case where the rights of citizenship are necessarily involved. But we have no hesitation in saying that their *status* is not, in the face of the facts we have stated, to be determined solely by the circumstance that some officer of the government has appointed for them an agent, even if we could take judicial notice of the existence of that fact, suggested to us in argument.

Turning our attention to the tenure by which these communities hold the land on which the settlement of defendant was made, we find that it is wholly different from that of the Indian tribes to whom the act of Congress applies. The United States have not recognized in these latter any other than a passing title with right of use, until by treaty or otherwise that right is extinguished. And the ultimate title has been always held to be in the United States, with no right in the Indians to transfer it, or even their possession, without consent of the government.

It is this fixed claim of dominion which lies at the foundation of the act forbidding the white man to make a settlement, on the lands occupied by an Indian tribe.

The pueblo Indians, on the contrary, hold their lands by a right superior to that of the United States. Their title dates back to grants made by the government of Spain before the Mexican revolution,—a title which was fully recognized by the Mexican government, and protected by it in the treaty of Guadaloupe Hidalgo, by which this country and the allegiance of its inhabitants were transferred to the United States.

With the purpose of carrying into effect this provision of that treaty, Congress directed the surveyor-general of New Mexico to make inquiry into all grants of the Spanish and Mexican governments, and to report to that body on their

validity. Such reports were made from time to time, one of which included, and recommended for confirmation, this claim of " the pueblo of Taos, in the county of Taos," not the pueblo Indians of Taos, but the pueblo of Taos; and by an act of Congress of Dec. 22, 1858, 11 Stat. 374, the title was confirmed, and the commissioner of the land-office ordered to " issue the necessary instructions for the survey of all of said claims, as recommended for confirmation by the said surveyor-general, and cause a patent to issue therefor, as in ordinary cases to private individuals: *Provided*, that this confirmation shall only be construed as a relinquishment of all title and claim of the United States to any of said lands, and shall not affect any adverse valid rights, should such exist."

It is unnecessary to waste words to prove that this was a recognition of the title previously held by these people, and a disclaimer by the government of any right of present or future interference, except such as would be exercised in the case of a person holding a competent and perfect title in his individual right.

If the defendant is on the lands of the pueblo, without the consent of the inhabitants, he may be ejected, or punished civilly by a suit for trespass, according to the laws regulating such matters in the Territory. If he is there with their consent or license, we know of no injury which the United States suffers by his presence, nor any statute which he violates in that regard.                                 *Judgment affirmed.*

NOTE. — In *United States* v. *Santistevan*, a suit for a similar offence, and brought here by writ of error to the same court, the same judgment was entered as in the preceding case.