**STATE OF NEW MEXICO ex rel. S.E. REYNOLDS, State Engineer, Plaintiff,**

v.

**R. Lee AAMODT, et al., Defendants.**

**No. 6639—M Civil.**

United States District Court,
D. New Mexico.

Sept. 18, 1985.

Thomas B. Rapkoch, Las Cruces, N.M., for Joseph J. Roybal.

Sterling F. Black, Albuquerque, N.M., for Robert S. Harper.

Montgomery, Federici & Andrews, Santa Fe, N.M., for N.A. Owings; Mrs. Edgar Rossin; Mrs. Albert Schmidt; A.P. MacDonald; Oscar B. Huffman; John P. Bradley; M.T. Hudgings; Louise H. Smith; Duncan J. Ross; Robert McKinney; Emily L. Bradley.

White, Koch, Kelly & McCarthy, L.C. White, Santa Fe, N.M., for C.V. Biemfohr; N.G. Collins; Bengt Carlson; Juanita Martinez; Frank H. Mercer; Otis Horn; Rufus C. Little; Clifford Pond; Ray Pond; George Yardman; Ellis Bauer; William C. Spain; Kirby Kennedy; Roy L. Melvin; Charlie Ortega; Thomas Andersen, Daniel Donald Van Soelen, co-Executors of the Estate of Virginia Carr Van Soelen, deceased; Leland Thompson, Jr. Marshall L. McCune; L.C. White; James Sheil; Kew Craft, Inc.; John C. Craig Jr.; Robert M. Landis and Elizabeth H. Landis.

Claude S. Sena, Santa Fe, N.M., for Jose F. Ortiz; Isaac Garcia; Josefa G. Sena; Mrs. Robert Sena; Mrs. Pablo Sena; Reyes R. Jacquez; Serafin Roybal; Dolores R. Roybal; Carolina R. Smith; Jose D. Roybal; Nestora R. Garduno; Adella R. Herrera; Vicente Roybal.

Bigbee, Byrd, Carpenter & Stephenson, Santa Fe, N.M., for Lewis Barker; Winifred G. Barker; Clifford Whitehead; W.A. Friedman; Marjorie M. Williams.

Snyder H. Downs, Santa Fe, N.M., for Ann Clark.

Jones, Gallegos, Snead & Wertheim, Santa Fe, N.M., for I.L. Boren d.b.a. Del Norte Truck Stop; Presciliano Trujillo; Louise T. McKinney.

Campbell & Olmsted, Santa Fe, N.M., for Mrs. Marjorie Williams; Charles Loughridge.

Mitchell & Mitchell, Santa Fe, N.M., for Lake Peak Corp.

Catron, Catron & Sawtell, Thomas B. Catron, Santa Fe, N.M., for Jerome R.A. Monks; Agnes James; George E. Challenger; Victor Babin; John A. Dillon, Jr.; Philip L. Shultz; M.R. Bigelow; John Crosby; George Willis; William H. Dougherty; Sue C. Bergere; William J. Wilson; Board of Educ. of City of Santa Fe, Herny R. Hoyt and Pablo Roybal.

Jere C. Corlett, Santa Fe, N.M., for C.C. Ladenberger.

Fred Standley, Santa Fe, N.M., for Sangre de Cristo Development Co., Inc., d/b/a Colonias de Santa Fe.

Ussery, Burciaga & Parrish, Albuquerque, N.M., for Pueblo of Isleta.

Ashby, Rose & Sholer, P.A., Philip R. Ashby, Albuquerque, N.M., for San Ildefonso Pueblo.

Rodey Firm-Wm. Schaab, Albuquerque, N.M., for Nambe Pueblo.

Zinn & Donnell, John D. Donnell, Santa Fe, N.M., for Pueblo de Tesuque.

Justin Reid, Santa Fe, N.M., for Charles S. Thomas & Elaine Thomas interest to Louis H. Smith & Burton L. Smith.

Montgomery, Andrews & Hannahs, P.A., Frank Andrews III, Nancy M. Anderson, Santa Fe, N.M., for Public Service Co. of New Mexico.

Thomas A. Garrity, Field Sol., Dept. of Interior, Amarillo, Tex., Charles N. Estes, Jr., Asst. U.S. Atty., Albuquerque, N.M., for U.S.

Sutin, Thayer & Browne, Donald M. Salazar, Santa Fe, N.M., for Pueblo de Pojoaque.

Watson, Stillinger & Lunt, Neil C. Stillinger, Santa Fe, N.M., for Ralph Petty and Virginia Goodwin, Co-personal representatives of the estate of Walter L. Goodwin, Jr., Bishop Lodge Co., Dr. Eliot F. Porter, Mrs. Letitia Evans Frank, Mrs. Wilfred Stedman, Acequia Madre Ditch Assoc., Mr. William Williams, Mr. Stanley Samuels.

Joseph G. Lawler, Sommer & Lawler, P.A., Santa Fe, N.M., for Pita E. Valencia.

Daniel A. Sanchez, Sp. Asst. Atty. Gen., Santa Fe, N.M., for S.E. Reynolds, Engineer.

Paul M. Seeley, Bernard Kleinman, Ltd., Chicago, Ill., for Elmer L. and Dorothy Dresslar.

Neil C. Stillinger, Santa Fe, N.M., for Richard and Mary Harris.

Lyle E. Teutsch, Jr., Santa Fe, N.M., for Stanley E. Teutsch.

C. Mott Woolley, Stephenson, Carpenter, Crout & Olmsted, Santa Fe, N.M., for Kilberg.

Peter Thomas White, G. Emlen Hall, Office of the State Engineer, Santa Fe, N.M., for State of N.M.

Richard A. Simms, Hinkle, Cox, Eaton, Coffield & Hensley, Santa Fe, N.M., for Peter Clout; Charles Klotsche; James Pease; Jon Gerster; Steve Flance; Mark Murry; John Egan and Betty Egan.

Myles Flint, Chief, Indian Resources Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for U.S. and Pueblo plaintiffs.

## MEMORANDUM OPINION AND ORDER

MECHEM, Senior District Judge.

The State Engineer of New Mexico filed this action to adjudicate the water of the Tesuque & Nambe/Pojoaque Stream System, a tributary of the Rio Grande, between the various water users within the watershed, including, among others, the United States and the Pueblos de Nambe, Pojoaque, San Ildefonso and Tesuque (Pueblos). N.M.Stat.Ann. 75-2-9 (1953). The United States purported to represent the Pueblos located within the watershed.

The Pueblos sought to intervene in their own right, to have their own counsel and to have their right to the use of the water of the stream system determined under the law of the United States, rather than the law of the State. The district court denied the right to intervene and determined that New Mexico law would establish the right of the Pueblos to the use of the water of the stream system.

The opinion was appealed to the Tenth Circuit Court of Appeals which ruled that the Pueblos were entitled to intervene, to have their own counsel, and to have their right to the use of the water of the stream system determined under the law of the United States. *State of N.M. v. Aamodt,* 537 F.2d 1102 (10th Cir.1976).

The two streams under adjudication, the Rio Tesuque and the Rio Nambe or Pojoaque, rise on the West slope of the Sangre de Cristo Mountains in the Santa Fe National Forest at an elevation above 11,000 feet and join at the Pueblo de Pojoaque, then flow as the Rio Pojoaque into the Rio Grande at the Pueblo de San Ildefonso. (Exhibit A). Both are relatively short, the Rio Tesuque being about 19 miles long, the Rio Nambe or Pojoaque being about 15 miles long. The two flow together as the Rio Pojoaque about seven miles. They are perennial in the upper reaches and torrential in the lower reaches, being fed by spring snow melt and rain generated primarily by summer thunder storms. The Little Tesuque is a tributary of Rio (Big) Tesuque. It flows out of the Forest through private lands where it joins the Big Tesuque south of Pueblo de Tesuque. There is a relatively heavily settled area of privately owned land located just north of Santa Fe along the Rio (Big) Tesuque be-

tween the National Forest and the Pueblo de Tesuque, upstream from the Pueblo. The Rio Nambe flows from the Santa Fe National Forest through the Nambe Executive Order land then through the Pueblo proper and onto Pojoaque Pueblo land before meeting the Rio Tesuque. Its tributaries, Rio Chupadero and Rio en Medio, rise in the Forest, flow through privately owned land then across the Tesuque and Nambe Pueblo lands and again across privately owned land before meeting Rio Nambe on Nambe Pueblo land.

The Pueblos existed in the area in which they are now located when the first European entry was made by Coronado's band in 1540. They were irrigating their lands at that time by means of diverting water from the stream system sought here to be adjudicated. Florence Hawley Ellis, *Summaries of the History of Water Use of the Pojoaque Valley Pueblos* Tesuque Section p. 40 *et seq.;* San Ildefonso Section p. 33 *et seq.;* Pojoaque Section p. 40 *et seq.;* Nambe Section p. 34 *et seq.* (August 1979, as revised November 1979).

In 1598, Juan de Onate established the first Spanish settlement at what is now called San Juan Pueblo. The litigant Pueblos were still practicing cultivation by irrigation on their lands. *Id.*

This Spanish settlement was moved to Santa Fe about 1610 where the capital was established.

Tesuque Pueblo is about 7 miles north of Santa Fe city limits.

The Pueblos continued to occupy and cultivate their lands in the Spanish period from 1598 to 1821 (except for a relatively short period after the 1680 Pueblo Rebellion) and under Mexico when it became independent. On August 18, 1846, the United States occupied the territory. The Pueblos were still occupying and cultivating their lands. *Id.*

## THE SPECIAL MASTER'S FINDINGS OF FACT

The Special Master made the following findings of fact on the rights of the Pueb-

los under Spanish and Mexican law, which I adopt or modify as noted, pursuant to Fed. R.Civ.P. 53(e)2.

General Finding No. 2: The lands and waters of the Pueblos of San Ildefonso, Tesuque, Nambe and Pojoaque were expressly "recognized" by the Spanish from the time of the Spanish conquest as their community patrimony, having been used and occupied exclusively by those Pueblos beginning some time prior to the 14th Century A.D. The law prohibited grants of land used and occupied by the Pueblos to anyone else and required the revision of non-Indian grants if they impaired the Pueblos' rights, including water rights, in such lands.

I have modified the Master's General Finding No. 2 to change the word "reserved" to the word "recognized" in reference to Pueblo lands and waters. The word "reserved" made the finding clearly erroneous, as it is a term of art in federal land law which applies to the federal government's setting aside of particular land for a particular purpose, such as for National Forests or Indian Reservations. It is the basis for the *Winters* doctrine of federal reserved water rights, which does not apply to Pueblo lands recognized by Spain and Mexico. *See Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). The Spanish government did not reserve Pueblo lands in the same way the United States reserves public land for use as an Indian reservation. It simply recognized them and protected them.

General Finding No. 6: The property rights of the Pueblos, whether characterized as a right to use, as occupancy and possession, as equitable title, or as restricted grants of ownership, continued to be recognized under Mexico. The Pueblos continued to be entitled to lands used and occupied outside their four-square-league boundaries. The Pueblos' right to their common lands, or *ejidos,* were also restricted against alienation and further were exempt from adverse possession or prescription.

I have modified the Master's General Finding No. 6 to change the words "grant boundaries" to the words "four-square-league boundaries." No physical evidence of grants from the Spanish crown to these four Pueblos exists today, nor did it exist in proceedings before the Surveyor General of New Mexico in 1856. Rather, their claim to royal grants is based on oral tradition. It is clearly erroneous to refer to their lands as formal grants.

However, their four-square-league boundaries plus additional lands in their possession were protected by Spanish law. The royal decree of October 15, 1713 provided:

Whereas the ordinances and laws of the Indies, and especially the eighth, book third of the recopilacion of the same, provide that locations, with sufficient water, land, timber, entrances and exits, for cultivation, be given to the settlements and towns (pueblos) of Indians which may be formed, and a common of one league, where they can pasture their cattle, without their being mixed with those of the Spaniards; and whereas I have been informed that these ordinances are not complied with, in any of their provisions, in all the missions of New Spain, the governors and agents not only neglecting to give lands to the Indians, in order that they may form towns, (pueblos), but even those who have lands are deprived of them by force; ... Therefore, by these presents, we direct—my Viceroy of New Spain, the Audience and Governors of the same—that, in view of the displeasure which this information has caused us, in future they provide a remedy for this pernicious abuse, and punish the transgressors of the aforesaid laws; and that in the compliance and fulfillment of the same they use their best endeavors and zeal in order that the lands, water, and pastures granted to them be given to the aforesaid recently converted Indians; ...
Done at Madrid on the fifteenth day of October, one thousand, seven hundred and thirteen. I the King: By order of the King, our sovereign: Don Diego de

Morales Velasco, countersigned with four rubrics.
*Annual Report of the Surveyor General of New Mexico, Sept. 30, 1856, in the Report of the Secretary of the Interior, House Executive Document 893, 1856–57,* at 519.

Book 6, Title 3, Law 8 of the *Recopilacion* provided:

The locations where there are to be established the Pueblos, and *Reducciones,* shall have sufficient waters, lands and woods, entrances and exits, and farm lands and an *Exido* [Commons] a league in length where the Indians may keep their livestock without their mingling with that of the Spaniards.

Espinosa, *Translation into English of the Recopilacion de Leyes de los Reynos de las Indias,* U.S. Dept. of Interior.

Book 4, Title 12, Law 18 of the *Recopilacion* provided:

We order that the sale, proceeds, and settlement of land be made with such consideration, that the Indians shall be given all the land [and more, if possible] that belongs to them, both as to individuals and communities alike, and, specially those lands where they may have made ditches [*acequias*], or any other improvement, such that with their personal industry, they have fertilized. This is to apply particularly with respect to water and irrigation. And for no reason can these lands be sold or taken away from them; and the judges who were sent for the purpose, shall make a list of the Indians found in these lands, and those [lands] that they may have turned over to each one of the taxpayers [*tributarios*], old men, exemptees, chiefs, governors, absentees, and communities.

*Id.* These preexisting lands had the same status under Spanish law as actual grants.

The Special Master's remaining general and specific findings of fact are unnecessary to my decision.

## SPECIAL MASTER'S CONCLUSIONS OF LAW

The Special Master made the following conclusions of law on the rights of the

Pueblos under Spanish and Mexican law which I adopt or modify, pursuant to Fed. R.Civ.P. 53(e)2.

1. Spanish and Mexican law recognized that the lands and waters traditionally used and occupied by the Pueblos, belong to them. The Pueblos' claim to such properties was never extinguished by either sovereign.

2. The Pueblos' lands and waters were expressly recognized and protected by Spanish law from the time of the Conquest, and this recognition by law was equivalent to legal ownership. After independence, Mexico recognized and protected the Pueblos' properties.

I have modified the Master's Conclusion No. 2 to remove references to Pueblo lands and waters being "reserved" and "granted", in conformity with modifications already noted in Findings 2 and 6.

3. Each Pueblo owned its land as a community or settlement and, under Spain, could not alienate such land without a royal license. Mexican law prohibited the alienation of any land within the Indian Pueblos' *ejido* or communal lands, which, in New Mexico, were measured by the four-square-league standard. Such lands could not legally be sold by individual members of the Pueblos, and the law protected them against prescription or adverse possession.

I have modified Conclusion No. 3 to change the word "municipality" to "community or settlement". The Pueblos were never formally chartered as municipalities under Spanish law, but had the status of municipalities under Spanish law.

4. The water rights of the Pueblos, which were recognized and protected by Spain and by Mexico, were defined as a prior and paramount right to a sufficient quantity to meet their present and future needs. Both Spain and Mexico used the flexible *repartimiento* system for allocating waters, under which the quantities allocated were never final, and did not have the effect of *res judicata*, but could be changed as needs changed.

I have modified Conclusion No. 4 to change the words "reserved and granted by Spain" to "recognized and protected by Spain", in conformity with modifications already noted in the Master's Findings of Fact.

5. (Not adopted).

6. Common uses of water were subject to two overriding servitudes in favor of all individuals to meet domestic and sanitary needs. Subject to such domestic and sanitary uses, all persons were entitled to use water for irrigation.

7. The use of water for irrigation was a usufructuary right appurtenant to land.

8. In the event of a dispute over the use of water, allocations and quantification of irrigation rights were made in a *repartimiento*.

9. A *repartimiento* was a quasi-judicial and administrative proceeding in which government officials applied controlling principles of equitable distribution to apportion available water supplies.

10. In a *repartimiento*, the domestic and sanitary needs of all users were first satisfied; persons holding *mercedes de aguas* [formal water grants] were then accorded priority based on the antiquity, that is, the date, of their grants [none existed in this stream system]; all other persons received an allocation of water for irrigation based upon the relative needs of all users and application of the principle of non-injury, that is, that no one's use of water should result in injury to any other person. A *repartimiento* thus attempted to balance the interests of all users in the water system.

11. Need was the measure of a water allocation in a *repartimiento*. Need consisted of what was necessary for maintenance, that is, to grow the necessary supply of food and crops for subsistence.

12. In a *repartimiento* for those without formal grants [which we are dealing with here], *antiquedad* or prior use, in the sense of the date of origin of use, was significant. The longer the period of time over which a person could demonstrate con-

tinuing use of water, the more likely he could show that such customary use constituted his existing needs.

13. In the Spanish colonial period, Indian irrigation rights were measured by the principle of *necesario para su sustento*, that which was necessary for their sustenance. To this extent, Indians were accorded a type of preference in the use of water for purposes of irrigation. The quantity of water which defined *necesario para su sustento* was determined by reference to customary and actual use, that is, the amount of water necessary to grow crops for basic life support in fields under cultivation.

14. In the Mexican period, the principles of the *repartimiento* continued to apply. Water disputes between Indians and non-Indians were settled no differently from water disputes among non-Indians. The principles of need and non-injury were considered in similar fashion in either case. The central factors in the determination of need were population and amount of land under cultivation necessary to sustain the population.

This Conclusion should be modified to state that, where Indians were involved, as in the Taos *repartimiento* of 1823, their long use was the dominant consideration in the determination of need, as set forth in the following section.

15. Under Mexican law, between 1821 and 1846, any person occupying the land of another, including Indian land, had the right to use water to irrigate the land and receive an allocation of water in a *repartimiento*, sufficient to meet the needs of his cultivation. So long as the person was in peaceable possession of the land his irrigation needs would be taken into account, and he would not lose his irrigation rights unless ejected from the land.

16. Under Mexican law, *repartimientos* did not give any preference, or prior and paramount interest, to Indian irrigation needs; instead, the competing needs of all water users were taken into account and allocations made on the basis of relative needs. By definition, the *repartimiento*

involved a balancing of needs to achieve an equitable distribution of available water.

17. Throughout the Spanish and Mexican periods, non-Indians occupied lands which are today located within the Pueblos' boundaries. The four Pueblos accepted the right of non-Indians to live within Pueblo boundaries, either as owners or persons in peaceful possession.

I have modified Conclusion No. 17 to change the words "Pueblos' grants" to "Pueblos' boundaries", in conformity with modifications already noted in the Master's Findings of Fact.

18. The Pueblo de San Ildefonso, the Pueblo de Pojoaque, the Pueblo de Nambe and the Pueblo de Tesuque are entitled to a first right or right of *primacia*, to enough water "for their needs," or the irrigation of their lands. All communities or settlements, including Indian Pueblos, are to be favored in the distribution of water "to maintain the community". Any expansion of water apportionment for any use should be done with as little injury as possible to any party. Availability of excess water should be granted to the Pueblos for their future expansion, based on need.

I have modified Conclusion No. 18 to change the word "municipalities" to "communities or settlements", in conformity with changes already noted in Conclusion No. 3.

## THE PUEBLOS UNDER SPANISH AND MEXICAN LAW

There were no *mercedes de aguas* in the territory now called New Mexico. The only recorded *repartimiento* that appeared in the area or that anyone has knowledge of involved the Rio de Lucero and the Pueblo of Taos, and comes from the Spanish Archives of New Mexico, Series 1, No. 1292 of the State Records Center and Archives as translated by Dr. Myra Ellen Jenkins. It states in part:

The natives of this Pueblo of Taos, besides the water of the river which cuts through their pueblo, have always used the water from the Rio de Lucero for

irrigating their cultivated fields, and it appears that they have done so from the period of their paganism, that is, since the foundation of their pueblo, with the sole object of enjoying the water of both rivers, from which it is inferred clearly that these natives, from time immemorial, have been the sole owners and have complete right to the water of the Rio de Lucero.

\*　　\*　　\*　　\*　　\*　　\*

The settlers of Arroyo Seco, ... have no right to the source of the Rio de Lucero for the irrigation of their lands, because the old grant which they claim favors them does not give them the right, ....

\*　　\*　　\*　　\*　　\*　　\*

Your Excellency will see from this report that the sons of this Pueblo, the aforesaid Indians, are the ones who have the right to the Rio de Lucero.

\*　　\*　　\*　　\*　　\*　　\*

But this *ayuntamiento*, having pity on the new settlers of Arroyo Seco, considered it carefully at various sessions and has ordered that one *surco* of water [Velasquez: a furrow. The parties agree that it amounts to 51 gallons per minute] shall be allowed them from the Rio de Lucero when the water is abundant, and when water is short it shall be given to them proportionately and according to the judgment of this *ayuntamiento*, so that there is no lack for the first ones who enjoy the antiquity and priority, who are the sons of the said Pueblo, and the surplus of these to those residents of San Fernando who settled there long before those of Arroyo Seco.

\*　　\*　　\*　　\*　　\*　　\*

God guard your excellency many years, Taos, December 30, 1823. s/ Juan Antonio Lobato, Juan de Jesus Vigil, for the Secretary.

It can thus be seen that priority in time of use and use were the paramount factors in determining need and the right to use water as of December 30, 1823, in New Mexico under the Mexican government.

As the Master's Conclusions of Law show, Spain considered the Pueblos as wards and sought to establish the rights of the Pueblos to use and live off lands with relatively certain boundaries which they occupied. This involved the right to use the water available for domestic purposes, stock watering and irrigation, recognizing that the Pueblos were prior in time in the use of the water. Non-Indians were prohibited from occupying lands or living on the Pueblo lands and were not to interfere with them. The non-Indians could use the water available, but not to the detriment of the Pueblos.

The Mexicans followed much the same practice toward the Pueblos although the Pueblos did become citizens of Mexico and were to be treated the same as all other citizens. The Mexican law abolishing racial distinctions was not generally practiced in the outlying provinces, and did not change the government's relationship to Pueblo community held land. The Pueblos continued to occupy and use their lands as before with the available water.

There were encroachments during the Spanish and Mexican periods on Pueblo lands with the use of water, none of which had a legal basis. Upholding Pueblo rights was slow and tedious at best.

There were land grants made to non-Pueblos in the stream system during this period. These were cultivated with the use of available water. Some of the grants overlapped Pueblo lands. None of the grants would have established water use as old as the Pueblos', whose use far pre-dated any Spanish or Mexican use. Ellis, *supra.*

## THE PUEBLOS UNDER UNITED STATES LAW

The Pueblos' status as property-owner citizens of the United States was provided for under the Treaty of Guadalupe Hidalgo (ratified May 30, 1848), proclaimed July 4, 1848. 9 Stat. 922–943. Article 8, which covers rights of Mexicans established in

territories ceded to the United States, reads in part:

In the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States.

9 Stat. 922, 929.

Article 9 provides that Mexicans remaining in ceded territory may become citizens of the United States. It states in part: "... and in the meantime [these Mexicans] shall be maintained and protected in the free enjoyment of their liberty and property ...." *Id.* at 930.

At that time the Pueblos were in full occupation and possession of the property that they had possessed and used long before and during the periods of Spanish and Mexican rule. This possession and use was recognized by both the Spanish and Mexican governments subject only to a prohibition against alienation without the sovereign's approval and the right of severance by the sovereign, which was never exercised. In effect, they came into the United States possessed in fee simple of the property which they occupied, *U.S. v. Joseph,* 4 Otto 614, 94 U.S. 614, 24 L.Ed. 295 (1876); *U.S. v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), restricted only in the power of alienation and subject to termination by Congress. They also irrigated those lands long before any of the other residents of the territory or of anyone else claiming any right to the use of the water. Ellis, *supra.*

Article 1, § 8 of the Constitution of the United States provides:

The Congress shall have power ... to regulate commerce with foreign nations, and among the several states, and with the Indian Tribes.

The 1834 Trade and Intercourse Act, 4 Stat. 730, § 12, codified at 25 U.S.C. § 177, provides:

No purchase, grant, lease or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution....

The 1851 Trade and Intercourse Act, 9 Stat. 587, § 7 extended the above prohibition to the Indian tribes in the territories of New Mexico and Utah.

The Confirmation Act of 1858, 11 Stat. 374, being an Act to confirm the land claims of certain Pueblos and towns in the Territory of New Mexico, provides:

[T]he Pueblo land claims in the Territory of New Mexico designated in the corrected lists as ... Pueblo of Tesuque in the county of Santa Fe, Pueblo of San Ildefonso in the county of Santa Fe, Pueblo of Pojoaque in the county of Santa Fe, reported upon favorably by the surveyor-general of New Mexico, in his report of the 30th of September, 1856, to the Department of the Interior, and the claim designated as ... Pueblo of Nambe, reported upon favorably by the said surveyor-general, on the 30th of November, 1856, ... be, and they are hereby, confirmed; and the Commissioner of the Land-Office shall issue the necessary instructions for the survey of all of said claims, as recommended for confirmation by the said surveyor-general, and shall cause a patent to issue therefor as in ordinary cases to private individuals: Provided, that this confirmation shall only be construed as a relinquishment of all title and claim of the United States to any of said lands, and shall not affect any adverse valid rights, should such exist. Approved, December 22, 1858.

The Supreme Court in *U.S. v. Joseph, supra,* considered the presence of a non-Indian settler on the Taos Pueblo lands from whom a fine was sought for trespass in violation of the 1851 Trade and Intercourse Act. These questions were raised: "Are the people who constitute the Pueblo or Village of Taos an Indian Tribe within the meaning of the Act?" and "Do they hold

the lands on which the settlement mentioned in the petition was made by a tenure which brings them within its terms?". The Court concluded that the tenure of the Pueblos was wholly different from that of Indian tribes to whom the 1851 Act of Congress applied.

> The United States have not recognized in these latter [Indian tribes] any other than a passing title with right of use, until by treaty or otherwise that right is extinguished. And the ultimate title has been always held to be in the United States, with no right in the Indians to transfer it, or even their possession, without consent of the government.
>
> It is this fixed claim of dominion which lies at the foundation of the act forbidding the white man to make a settlement on the lands occupied by an Indian tribe.
>
> The pueblo Indians, on the contrary, hold their lands by a right superior to that of the United States. Their title dates back to grants made by the government of Spain before the Mexican revolution,—a title which was fully recognized by the Mexican government, and protected by it in the treaty of Guadaloupe Hidalgo, by which this country and the allegiance of its inhabitants were transferred to the United States.
>
> With the purpose of carrying into effect this provision of that treaty, Congress directed the surveyor-general of New Mexico to make inquiry into all grants of the Spanish and Mexican governments, and to report to that body on their validity. Such reports were made from time to time, one of which included, and recommended for confirmation, this claim of "the pueblo of Taos, in the county of Taos," not the pueblo Indians of Taos, but the pueblo of Taos; and by an act of Congress of Dec. 22, 1858, 11 Stat. 374, the title was confirmed and the commissioner of the land-office ordered to "issue the necessary instructions for the survey of all of said claims, as recommended for confirmation by the said surveyor-general, and cause a patent to issue therefor, as in ordinary cases to private individuals: Provided, that this

confirmation shall only be construed as a relinquishment of all title and claim of the United States to any of said lands, and shall not affect any adverse valid rights, should such exist."

> It is unnecessary to waste words to prove that this was a recognition of the title previously held by these people, and a disclaimer by the government of any right of present or future interference, except such as would be exercised in the case of a person holding a competent and perfect title in his individual right.

94 U.S. at 618–19. This created the chaotic identification of Pueblo title as different from Indian Tribal property. Congress by enactment of the Pueblo Lands Act of June 7, 1924, 43 Stat. 636, established that *Joseph* was in error in holding that the title of the Pueblos was superior to that of the United States.

As a result, others than Pueblo Indians occupied Pueblo lands, with or without good faith lease, sale or conveyance by the Pueblos or the United States.

Congress did continue to exercise its control and trust responsibility over the Pueblos. The Territory had attempted to tax the lands and the property of the Pueblos. In 1905, Congress specifically forbade this, saying

> That the lands now held by the various villages or pueblos of Pueblo Indians, or by individual members thereof, within Pueblo reservations or lands, in the Territory of New Mexico, and all personal property furnished said Indians by the United States, or used in cultivating said lands, and any cattle and sheep now possessed or that may hereafter be acquired by said Indians shall be free and exempt from taxation of any sort whatsoever, including taxes heretofore levied, if any, until Congress shall otherwise provide.

33 Stat. 1048, 1069.

The Enabling Act for New Mexico of June 20, 1910, 36 Stat. 557, should have settled the question of Congress' authority over the Pueblos for good.

Section 2 provides:

First. That ... the sale, barter, or giving of intoxicating liquors to Indians and the introduction of liquors into Indian country, which term shall also include all lands now owned or occupied by the Pueblo Indians of New Mexico, are forever prohibited.

Second. That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof and to all lands lying within said boundaries owned or held by any Indian or Indian tribes the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States; ...

36 Stat. at 558–559.

No one has been heard to put forth the notion that the Pueblos are not Indians, even the *Joseph* Court.

The decision in *U.S. v. Sandoval, supra,* then came down. The question was whether Congress had usurped the police power of the State of New Mexico in prohibiting the introduction of intoxicating liquor into Indian country (specifically Santa Clara Pueblo) by extending the Act of January 30, 1897, 29 Stat. 506, to Pueblo land. Was the "status of the Pueblo Indians and their lands ... such that Congress competently can prohibit the introduction of intoxicating liquor into those lands notwithstanding the admission of New Mexico to statehood?" 231 U.S. at 38, 34 S.Ct. at 2. The Court determined that the members of Santa Clara Pueblo were Indians in race, customs and domestic government.

The *Sandoval* Court continued:

"Taking these decisions together, it may be taken as the settled doctrine of this court that Congress, in pursuance of the long-established policy of the Government, has a right to determine for itself when the guardianship which has been maintained over the Indians shall cease. It is for that body, and not for the courts, to determine when the true interests of the Indian require his release from such condition of tutelage." [citing *Tiger v. Western Investment Co.,* 221 U.S. 286, 315, 31 S.Ct. 578, 586, 55 L.Ed. 738 (1911)]

\*     \*     \*     \*     \*     \*

[I]n respect of distinctly Indian communities the questions whether, to what extent, and for what time they shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts. *U.S. v. Holliday,* 3 Wall. 407, 419 [18 L.Ed. 182]. [Other citations omitted.]

\*     \*     \*     \*     \*     \*

As was said in *U.S. v. Holliday, supra:* "In reference to all matters of this kind, it is the rule of this court to follow the executive and other political departments of the Government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same. If they are a tribe of Indians, then, by the Constitution of the United States, they are placed, for certain purposes, within the control of the laws of Congress. This control extends, as we have already shown, to the subject of regulating the liquor traffic with them. This power residing in Congress, that body is necessarily supreme in its exercise."

\*     \*     \*     \*     \*     \*

It also is said that such legislation cannot be made to include the lands of the Pueblos, because the Indians have a fee simple title. It is true that the Indians of each pueblo do have such a title to all the lands connected therewith, excepting such as are occupied under executive orders, but it is a communal title, no individual owning any separate tract.

\*     \*     \*     \*     \*     \*

We are not unmindful that in *U.S. v. Joseph,* [4 Otto 614], 94 U.S. 614, [24 L.Ed. 295], there are some observations not in accord with what is here said of these Indians, but as that case did not turn upon the power of Congress over them or their property, but upon the interpretation and purpose of a statute not nearly so comprehensive as the legislation now before us, and as the observations there made respecting the Pueblos were evidently based upon statements in the opinion of the territorial court, then under review, which are at variance with other recognized sources of information, now available, and with the long continued action of the legislative and executive departments, that case cannot be regarded as holding that these Indians or their lands are beyond the range of Congressional power under the Constitution. 231 U.S. at 46–49, 34 S.Ct. at 5–7.

Because of the unsettled question of non-Pueblo use and occupancy of what had traditionally been Pueblo land and water, whether by sale, occupation, lease, squatting or otherwise, in good faith or not, created primarily by the decision in *U.S. v. Joseph, supra,* and *U.S. v. Sandoval, supra,* Congress passed the Pueblo Lands Act on June 7, 1924, *supra.* It provided that:

[I]n order to quiet title to various lots, parcels, and tracts of land in the State of New Mexico for which claim shall be made by or on behalf of the Pueblo Indians of said State as hereinafter provided, the United States of America, in its sovereign capacity as guardian of said Pueblo Indians shall, ..., file in the District Court of the United States for the District of New Mexico, its bill or bills of complaint with a prayer for discovery of the nature of any claim or claims of any kind whatsoever adverse to the claim of said Pueblo Indians, as hereinafter determined.

Section 2. That there shall be, and hereby is, established a board to be known as "Pueblo Lands Board"....

\*   \*   \*   \*   \*   \*

It shall be the duty of said board to investigate, determine and report and set forth by metes and bounds ... the lands within the exterior boundaries of any land granted or confirmed to the Pueblo Indians of New Mexico by any authority of the United States of America, or any prior sovereignty, or acquired by said Indians as a community by purchase or otherwise, title to which the said board shall find not to have been extinguished in accordance with the provisions of this Act, ... Provided, however, that the board shall be unanimous in all decisions whereby it shall be determined that the Indian title has been extinguished.

Section 4 allowed limitations to establish ownership in non-Pueblos if held under color of title from January 6, 1902, and without color of title from March 16, 1889. A plea so established would entitle the claimant to a quitclaim against the United States and the Indians.

Section 6. It shall be the further duty of the board to separately report in respect of each such pueblo—

(a) The area and character of any tract or tracts of land within the exterior boundaries of any land granted or confirmed to the Pueblo Indians of New Mexico and the extent, source, and character of any water right appurtenant thereto in possession of non-Indian claimants at the time of filing such report, which are not claimed for said Indians by any report of the board.

43 Stat. at 636–637.

As a result of the action of the Lands Board, investigations were made, titles were established, and rights of possession and other rights of use and occupancy were determined. This resulted in some loss of land and water by the Pueblos, as well as dispossession of some non-Pueblos of Pueblo lands.

In its first report under Section 6 of the 1924 Act, for Tesuque Pueblo, the Lands Board stated that "The source wherefrom such non-Indian claimants obtained such water rights are their deeds thereto, coupled with long use, in accordance with the

custom of the country, and the law of the Territory and State of New Mexico." Exh. JP–30, at 10. In its second and subsequent reports, the Lands Board elaborated further on the comparative relationship between Pueblo and non-Pueblo water rights. In addition to the above statement of the source of non-Indian rights, the Nambe report stated:

We find that the Nambe Indians, whether their water is derived from exclusively Indian ditches, or community ditches, are entitled to a priority of right over non-Indian users for such water from the Nambe River as may be necessary for the lands now in cultivation or which may be necessary for the proper cultivation by them of such available lands as may be required for their support and sustenance. The water rights out of the Nambe River appurtenant to the land within this Pueblo Grant in possession of non-Indian claimants, and not claimed for the Indians by any report of this Board, are, in the opinion of the Board, all subsequent to the Indians' rights for water from that river for such lands as they are now cultivating or may themselves hereafter cultivate within the boundaries of either the Nambe Indian Grant or the Executive Order Additions thereto.

Exh. JP–32, at 5. A similar statement was made in the San Ildefonso report. The Pojoaque report simply referred to the Nambe and San Ildefonso reports already quoted. Exh. JP–43 at 17–18; JP–45 at 5.

The 1933 Pueblo Compensation Act, 48 Stat. 108, enacted to compensate the Pueblos for their loss of lands and water and the non-Pueblo good-faith settlers of Pueblo land who could not establish their claims under the 1924 Act for their loss of use and occupancy of Pueblo land, provided that:

Section 9. Nothing herein contained shall in any manner be construed to deprive any of the Pueblo Indians of a prior right to the use of water from streams running through or bordering on their respective pueblos for domestic, stockwater, and irrigation purposes for the lands remaining in Indian ownership, and such water rights shall not be subject to loss by non-use or abandonment thereof as long as title to said lands shall remain in the Indians.

48 Stat. at 111.

The meaning and intent of Section 9 has caused endless argument and a variety of contention by those engaged in drafting, enacting and lobbying the legislation and by the parties to this action. Further discussion of Section 9 is in the section on Aboriginal Rights.

## EQUITABLE APPORTIONMENT

█ The State has raised equitable apportionment as a proper remedy to determine rights to use water in this stream system. It is not applicable. Equitable apportionment, as applied to date, is the doctrine of federal common law that governs disputes between states concerning their rights to use the waters of an interstate stream. *Colorado v. N.M.*, 459 U.S. 176, 183, 103 S.Ct. 539, 545, 74 L.Ed.2d 348 (1982); *Arizona v. California*, 373 U.S. 546, 565, 83 S.Ct. 1468, 1480, 10 L.Ed.2d 542 (1963). The Pueblos have not been determined to be sovereign states. The State is not here ostensibly as an owner of a water right within the system. Its position is to see that the rights to use water are apportioned to the rightful owners under existing law.

## ABORIGINAL RIGHTS

The United States and the Pueblos claim aboriginal rights among other claims. *U.S. as Guardian of the Hualpai Indians of Arizona v. Santa Fe Pacific R.R.*, 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941), involved a challenge to the Walapai's (Hualpai's) aboriginal title by the railroad which had received a grant from the United States within the area claimed by the Walapais. The suit was brought by the United States to enjoin the railroad from interfering with the possession and occupancy by the Indians. The Walapais did not hold under treaty, statute or other formal governmental action. A question also being

considered was what effect the existence of the Tribe within the area ceded by Mexico under the Treaty of Guadalupe Hidalgo might have on aboriginal title. The Court said:

> Perhaps the assumption that aboriginal possession would be respected in the Mexican Cession was, like the generalizations in *Johnson v. McIntosh*, [8 Wheat. 543, 5 L.Ed. 681], not necessary for the narrow holding of the case. But such generalizations have been so often and so long repeated as respects land under the prior sovereignty of the various European nations, including Spain, that, like other rules governing titles to property (*U.S. v. Title Ins. & Trust Co.*, 265 U.S. 472, 486–87 [44 S.Ct. 621, 623, 68 L.Ed. 1110]) they should now be considered no longer open .... Certainly it would take plain and unambiguous action to deprive the Walapais of the benefits of that policy.

> \*     \*     \*     \*     \*     \*

Nor is it true, as respondent urges, that a tribal claim to any particular lands must be based upon a treaty, statute, or other formal government action. As stated in the *Cramer* case, "The fact that such right of occupancy finds no recognition in any statute or other formal governmental action is not conclusive." [*Cramer v. U.S.*,] 261 U.S. at 229 [43 S.Ct. at 344].

> \*     \*     \*     \*     \*     \*

The Indian Trade and Intercourse Act of June 30, 1834, 4 Stat. 729, was extended over "the Indian tribes in the Territories of New Mexico and Utah" by § 7 of the Act of February 27, 1851, 9 Stat. 574, 587.

> \*     \*     \*     \*     \*     \*

The Act of 1851 obviously did not create any Indian right of occupancy which did not previously exist. But it plainly indicates that in 1851 Congress desired to continue in these territories the unquestioned general policy of the Federal Government to recognize such right of occupancy.

> \*     \*     \*     \*.     \*     \*

As stated in *Choate v. Trapp*, 224 U.S. 665, 675 [32 S.Ct. 565, 569, 56 L.Ed. 941], the rule of construction recognized without exception for over a century has been that "doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith." 314 U.S. at 346–48, 354, 62 S.Ct. at 251–52, 255.

A later case is *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (*Oneida I*). It sets out,

> It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States.... The United States also asserted the primacy of federal law in the first Nonintercourse Act passed in 1790, 1 Stat. 137, 138, which provided that "no sale of lands made by any Indians ... within the United States, shall be valid to any person ... or to any state ... unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." This has remained the policy of the United States to this day. *See* 25 U.S.C. § 177.

In *United States v. Santa Fe Pacific R. Co.*, 314 U.S. 339, 345 [62 S.Ct. 248, 251, 86 L.Ed. 260] (1941), a unanimous Court succinctly summarized the essence of past cases in relevant respects:

" 'Unquestionably it has been the policy of the Federal Government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States.' *Cramer v. United States*, 261 U.S. 219, 227 [43 S.Ct. 342, 344, 67 L.Ed. 622]. . . ."

The *Santa Fe* case also reaffirmed prior decisions to the effect that a tribal right of occupancy, to be protected, need not be "based upon a treaty, statute, or other formal government action." *Id.* [314 U.S.], at 347 [62 S.Ct. at 252]. Tribal rights were nevertheless entitled to the protection of federal law, and with respect to Indian title based on aboriginal possession, the "power of Congress . . . is supreme." *Ibid.*

\*　\*　\*　\*　\*　\*

The possessory and treaty rights of Indian tribes to their lands have been the recurring theme of many other cases. [Citing in the footnote *U.S. v. Sandoval*, 231 U.S. 28 [34 S.Ct. 1, 58 L.Ed. 107] (1913) ].

414 U.S. at 667–69, 94 S.Ct. at 777–78.

A later opinion reflects the continuing view of the Court on aboriginal rights. *County of Oneida, New York, et al. v. Oneida Indian Nation of New York State,* —— U.S. ——, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (Oneida II). The case presents a question whether the Oneida Indians may bring a suit for damages for the occupation and use of tribal land allegedly conveyed unlawfully in 1795.

By the time of the Revolutionary War, several well-defined principles had been established governing the nature of a tribe's interest in its property and how those interests could be conveyed. It was accepted that Indian nations held "aboriginal title" to lands they had inhabited from time immemorial. *See* Cohen, Original Indian Title, 32 Minn.L.R.

28 (1947). The "doctrine of discovery" provided, however, that discovering nations held fee title to these lands, subject to the Indians' right of occupancy and use. As a consequence, no one could purchase Indian land or otherwise terminate aboriginal title without the consent of the sovereign.[3] *Oneida I,* 414 U.S. at 667 [94 S.Ct. at 777].

In footnote 3, the Court set out the Doctrine of Discovery.

"[D]iscovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession.

"The exclusion of all other Europeans, necessarily gave to the nation making the discovery the sole right of acquiring the soil from the natives, and establishing settlements upon it. . . .

"The rights thus acquired being exclusive, no other power could interpose between [the discoverer and the natives].

"In the establishment of these relations, the rights of the original inhabitants were in no instance, entirely disregarded; but were necessarily, to a considerable extent, impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil at their own will, to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it." *Johnson v. McIntosh,* 8 Wheat. 543, 573–74 [5 L.Ed. 681] (1823).

The Court continued:

With the adoption of the Constitution, Indian relations became the exclusive province of federal law. *Oneida I, supra* [414 U.S.] at 670 [94 S.Ct. at 778] [further citation omitted.]. From the first Indian claims presented, this Court recognized the aboriginal rights of the Indians to their lands. The Court spoke

of the "unquestioned right" of the Indians to the exclusive possession of their lands, *Cherokee Nation v. Georgia*, 5 Pet. 1, 17 [8 L.Ed. 25] (1831), and stated that the Indians' right of occupancy is "as sacred as the fee simple of the whites." *Mitchel v. U.S.*, 9 Pet. 711, 746 [9 L.Ed. 283] (1835). This principle has been reaffirmed consistently. [Citation omitted.] Thus, as we concluded in *Oneida I*, "the possessory right claimed [by the Oneidas] is a *federal* right to the lands at issue in this case." 414 U.S. at 671 [94 S.Ct. at 779] (emphasis in original).

\* \* \* \* \* \*

In 1822 Congress amended the 1802 version of the [Nonintercourse] Act to provide that "in all trials about the right of property, in which Indians shall be party on one side and white persons on the other, the burden of proof shall rest upon the white person, in every case in which the Indian shall make out a presumption of title in himself from the fact of previous possession and ownership." § 4, 3 Stat. 683; see 25 U.S.C. § 194.

Most recently, in *Wilson v. Omaha Indian Tribe*, 442 U.S. 653 [99 S.Ct. 2529, 61 L.Ed.2d 153] (1979), ... [t]he Omahas based their claim for possession on aboriginal title. The Court construed the 1822 amendment to apply to suits brought by Indian tribes as well as individual Indians.... [T]he Court interpreted the amendment to be part of the overall "design" of the Nonintercourse Acts "to protect the rights of Indians to their properties." *Id.*, at 664 [99 S.Ct. at 2536]. [Further citation omitted.]

\* \* \* \* \* \*

There is no federal statute of limitations governing federal common-law actions by Indians to enforce property rights.... We think the borrowing of a state limitations period in these cases would be inconsistent with federal policy. Indeed, on a number of occasions Congress has made this clear with respect to Indian land claims.

\* \* \* \* \* \*

The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians. Thus, it is well established that treaties should be construed liberally in favor of the Indians. *Choctaw Nation v. United States*, 318 U.S. 423, 431–32 [63 S.Ct. 672, 677–78, 87 L.Ed. 877] (1943); *Choate v. Trapp*, 224 U.S. 665, 675 [32 S.Ct. 565, 569, 56 L.Ed. 941] (1912), with ambiguous provisions interpreted to their benefit, *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 174 [93 S.Ct. 1257, 1263, 36 L.Ed.2d 129] (1973); *Carpenter v. Shaw*, 280 U.S. 363, 367 [50 S.Ct. 121, 122, 74 L.Ed. 478] (1930); *Winters v. United States*, 207 U.S. 564, 576–77 [28 S.Ct. 207, 211, 52 L.Ed. 340] (1908). "Absent explicit statutory language," *Washington v. Fishing Vessel Assn.*, 443 U.S. 658, 690 [99 S.Ct. 3055, 3077, 61 L.Ed.2d 823] (1979), this Court accordingly has refused to find that Congress has abrogated Indian treaty rights.

\* \* \* \* \* \*

The Court has applied similar canons of construction in nontreaty matters. Most importantly, the Court has held that congressional intent to extinguish Indian title must be "plain and unambiguous," *United States v. Santa Fe Pacific R. Co.*, 314 U.S., at 346 [62 S.Ct. at 251], and will not be "lightly implied," *id.*, at 354 [62 S.Ct. at 255]. Relying on the strong policy of the United States "from the beginning to respect the Indian right of occupancy," *id.*, at 345 [62 S.Ct. at 251] (citing Cramer v. United States, 261 U.S. 219, 227 [43 S.Ct. 342, 344, 67 L.Ed. 622] (1923)), the Court concluded that it "[c]ertainly" would require "plain and unambiguous action to deprive the [Indians] of the benefits of that policy," *id.*, at 346 [62 S.Ct. at 251].

\* \* \* \* \* \*

The decisions of this Court emphasize "Congress' unique obligation toward the Indians." *Morton v. Mancari*, 417 U.S.

535, 555 [94 S.Ct. 2474, 2485, 41 L.Ed.2d 290] (1974).

—— U.S. at —— – ——, 105 S.Ct. at 1261.

The Supreme Court recently said, referring to the State of Montana,

The State fails to appreciate, however, that the standard principles of statutory construction do not have their usual force in cases involving Indian law. As we said earlier this Term, "[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians" *Oneida County v. Oneida Indian Nation*, 470 U.S. ——, —— [105 S.Ct. 1245, 1258, 84 L.Ed.2d 169] (1985). Two such canons are directly applicable in this case: first, the States may tax Indians only when Congress has manifested clearly its consent to such taxation, *e.g.*, *Bryan v. Itasca County, supra*, [426 U.S. 373], at 393 [96 S.Ct. 2102 at 2113, 48 L.Ed.2d 710 (1976)]; second, statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit, *e.g. McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 174 [93 S.Ct. 1257, 1263, 36 L.Ed.2d 129] (1973); *Choate v. Trapp*, 224 U.S. 665, 675 [32 S.Ct. 565, 569, 56 L.Ed. 941] (1912).

*Montana v. Blackfeet Tribe of Indians*, —— U.S. ——, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985).

██ This line of cases establishes that the Pueblos have aboriginal title, Indian rights or original Indian rights to their lands and the use of them including appurtenances.

They also have the right in fee simple granted by Congress in 1858 and evidenced by patents or quitclaims subject only to termination by Congress as was done by the 1924 and 1933 Pueblo Lands Acts, *supra*.

They developed and had the only rights to use all of the waters of the Nambe/Pojoaque and Tesuque Stream System until the advent of the Spanish. Ellis, *supra*.

These rights have continued up until the present day, saving and excepting those terminated by the 1924 Pueblo Lands Act, *supra*. While the 1924 Act provided for the termination of the Pueblos' ownership of specific lands within the Pueblos and termination of the right to the use of the water of the stream system thereon, it did not terminate the prior rights of the Pueblos to the use of the water on their remaining lands. It did not transfer aboriginal rights to non-Pueblos. Section 9 of the 1933 Act, *supra*, affirmed the prior right of the Pueblos to the use of water for the lands remaining in their ownership and that these priorities were not taken away by either the 1924 or 1933 Acts.

## PUEBLO WATER RIGHTS

The Pueblos had long established rights to the use of water on their lands and for domestic purposes which were recognized by Spain and Mexico.

██ The Pueblos came into the United States with these long established priorities and with their aboriginal rights to use the water for irrigation purposes. The United States recognized the Pueblos' ownership of the land by the execution of patents vesting title in them. The 1858 Confirmation Act, *supra*, did not terminate Congress' jurisdiction over these lands. Termination must be spelled out in clear and unmistakable language. *U.S. as Guardian of the Hualpai Indians of Arizona v. Santa Fe Pacific R.R., supra* 314 U.S. at 353–54, 62 S.Ct. at 255. Such language does not appear in the 1858 Act. Although the Pueblo lands were determined not to be Indian tribal lands under the Trade and Intercourse Act by *U.S. v. Joseph, supra*, Congress never terminated its jurisdiction as to them in any fashion nor disposed of any Pueblo land or the right to use water until the passage of the 1924 Pueblo Lands Act, *supra*. The prior rights of the Pueblos to use the water of the stream system were not terminated by the 1924 Act as to the lands still held by them. These rights were specifically recognized and affirmed by Sec. 9 of the 1933 Act, *supra*.

The Supreme Court has consistently held that only Congress has the power to terminate Indian aboriginal rights. *U.S. v. Sandoval, supra; U.S. as Guardian of the Hualpai Indians of Arizona v. Santa Fe Pacific R.R., supra; Oneida II, supra.* While some prior rights and aboriginal rights were terminated by the 1924 Act, those rights were not vested by Congress in the non-Pueblos who established title to land within the Pueblos under the Act. Water rights vested in the non-Pueblos as of the time they began use of the water under New Mexico law or the law of any prior sovereign. There is no evidence that any non-Pueblo in this stream system obtained any water right by grant or adjudication for use on what were Pueblo lands pursuant to law or confirmed by any prior sovereign. Congress terminated the aboriginal priority of the Pueblos as to some lands but did not vest that priority in others. The Pueblo Lands Board so found in its reports on non-Indian water rights under Section 6 of the 1924 Act, quoted above. The concept of tacking the priority of a grantor (Pueblo) to that of a grantee (non-Pueblo), or the doctrine of relation back, is not applicable here. Its application would dilute the priority for water for the remaining Pueblo lands. Nothing in the 1924 Act indicates that Congress intended such a result. To repeat, Section 9 of the 1933 Act clearly stated that such a result was not to be read into the Act.

■ The Pueblos have the prior right to use all of the water of the stream system necessary for their domestic uses and that necessary to irrigate their lands, saving and excepting the land ownership and appurtenant water rights terminated by the operation of the 1924 Pueblo Lands Act, *supra.* The acreage to which this priority applies is all acreage irrigated by the Pueblos between 1846 and 1924. Acreage under irrigation in 1846 was protected by federal law including the Treaty of Guadalupe Hidalgo, *supra,* and the 1851 Trade and Intercourse Act, *supra.* The Pueblo aboriginal water right, as modified by Spanish and Mexican law, included the right to irrigate new land in response to need. Acreage brought under irrigation between 1846 and 1924 was thus also protected by federal law. The 1924 Act, which gave non-Pueblos within the Pueblo four-square-leagues their first legal water rights, also fixed the measure of Pueblo water rights to acreage irrigated as of that date.

■ *Winters* rights exist on the Pueblo lands set aside by Executive Order for Nambe Pueblo on September 4, 1902 and any other Executive Order or Congressional reservations that may exist. Nambe and other Pueblos with Executive Order or Congressional reservations have priority to irrigate all of the irrigable acreage within the reservation subject to prior uses established before the date of the creation of the reservation. Other Pueblo lands do not have *Winters* rights. These other Pueblo lands and appurtenant water were in their possession and use long before the sovereignty of the United States or the adoption of the *Winters* doctrine. The Pueblos also acquired paper title to their property from the United States by patent which recognized them as owners under the Treaty of Guadalupe Hidalgo. A *Winters* right for these lands would fix an unrealistic priority.

■ The non-Pueblos' priorities begin as of the date they applied water to the land they used or occupied and which have not been lost by non-use pursuant to the law of Spain or Mexico or the Territory or State of New Mexico.

## GROUND WATER

■ The Pueblo water rights appurtenant to their lands are the surface waters of the stream systems and the ground water physically interrelated to the surface water as an integral part of the hydrologic cycle. *Cappaert v. U.S.,* 426 U.S. 128, 142, 96 S.Ct. 2062, 2071, 48 L.Ed.2d 523 (1976). The Pueblos have the prior right to the use of this water.

## INTERLOCUTORY ORDER

IT IS ORDERED that this memorandum opinion and order is hereby certified for

interlocutory appeal under 28 U.S.C. § 1292(b). This memorandum opinion involves a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate appeal from it may materially advance the ultimate termination of this lawsuit.

1012

EXHIBIT A

COMPOSITE MAP, QUADRANGLE 30 & 31
NEW MEXICO STATE HIGHWAY DEPARTMENT – 1984

Scale: 1/2" = 1 Mile