**UNITED STATES of America, on its own behalf and on behalf of the Pueblo of Santo Domingo, Plaintiff, and**

**The Pueblo of Santo Domingo, Plaintiff–Intervenor,**

v.

**Leland THOMPSON, Jr., et al., Defendants.**

**No. CIV 84–0314 JC.**

United States District Court, D. New Mexico.

Feb. 2, 1989.

L.R. Felicetti, Albuquerque, N.M., pro se.
Donna Higdon, pro se.

Skip Saurman, Santa Fe, N.M., pro se.

Robert S. Marshall, Mary E. Marshall, Santa Fe, N.M., pro se.

Fred A. Lovett, Albuquerque, N.M., pro se. Lloyce Lovett, Albuquerque, N.M., pro se.

Jack Piper, Cerrillos, N.M., pro se.

Downes, Comeau & Silver, P.A., John K. Silver, Santa Fe, N.M., pro se.

David F.B. Smith, Douglas J. Apostol, Brian V. Faller, William T. Finley, Jr., Pierson Semmes and Finley, Washington, D.C., pro se.

Brooks Blair, Dallas, Tex., pro se.

J.D. Page, Big Lake, Tex., pro se.

Sommer, Udall & Hardwick, Kimball R. Udall, Santa Fe, N.M., pro se.

Philip Gudwin, Santa Fe, N.M., pro se.

John F. Gaines, Sara Gaines, Santa Fe, N.M., pro se.

Stephen E. Hosford, Santa Fe Southern Pacific Corp., Albuquerque, N.M., for Cherokee and Pittsburg Coal and Min. Co. and Santa Fe Mining, Inc.

James C. Hall, Anita H. Frantz, Albuquerque, N.M., for Sam E. Brown, Jerry J. Brown, Mesita Village Inc.

H. Perry Ryon, Albuquerque, N.M., for The Mountain States Tel. & Tel. Co.

Melton & Puccini, P.A., Robert E. Melton, Albuquerque, N.M., for DeVargas Sav. & Loan.

Richard W. Hughes, Rothstein, Bennett, Daly, Donatelli & Hughes, Santa Fe, N.M., for plaintiff-intervenor Pueblo of Santo Domingo.

Herbert A. Becker, Asst. U.S. Atty., Albuquerque, N.M.

Charles O'Connell, Indian Resources Section, Land & Natural Resources Div., Dept. of Justice, Washington, D.C.

Reese C. Jones, Sp. Asst. Atty. Gen., Santa Fe, N.M.

## MEMORANDUM OPINION

CONWAY, District Judge.

THIS MATTER came on for consideration of the Alexandre Defendants' Motion for Summary Judgment, filed February 13, 1987;[1] Plaintiffs' Cross–Motion for Summary Judgment, filed April 1, 1987; and Defendants' Joint Motion in Limine, or Alternatively, Motion to Strike, filed June 1, 1987. The Court has reviewed the motions and memoranda submitted by the parties and heard the oral argument of counsel on September 8, 1988. Being otherwise fully advised in the premises, the Court finds that the defendants' Motion for Summary Judgment is well-taken and will be *granted* and that the defendants' Motion In Limine is not well-taken and will be *denied.*

### I. Background Facts

A. Alienability of Pueblo Indian Land

Plaintiffs filed this action for quiet title and declaratory judgment on March 9, 1984 alleging that defendants' claim title to and are in possession of certain "overlap" land which belongs to the Pueblo of Santo Domingo by virtue of a seventeenth-century Spanish land grant and subsequent confirmation and patenting of the land by the United States. The area of the overlap land is approximately 24,000 acres. It is located between Albuquerque and Santa Fe, New Mexico. The land in question is referred to as "overlap" land because it is also alleged be part of the Mesita De Juana Lopez Grant (MDJL). This grant was confirmed on January 28, 1879 by the United States Congress. It was never patented.

When the Territory of New Mexico was ceded to the United States under the Treaty of Guadalupe Hidalgo in 1848,[2] the United States determined to give all former Mexican citizens the same rights to the

---

1. Various defendants filed motions for summary judgment. These defendants also joined in one another's summary judgment motions. As the Court's ruling on the Alexandre defendants' motion is dispositive of the claims of all the defendants, the Court need not consider the other defense motions for summary judgment.

2. Treaty of Peace, Friendship, Limits and Settlement between the United States of America and the Mexican Republic, 9 Stat. 922.

enjoyment of their property that they had enjoyed under the previous sovereign. Under Mexican sovereignty, the Pueblo Indians had been able to freely alienate their land. This was in distinct contrast to Indians living under American sovereignty, who were prevented from freely alienating their land by the Nonintercourse Act. 4 Stat. 730, 25 U.S.C. § 177. Between 1848 and 1912, when New Mexico became a state,[3] residents of the New Mexico territory believed that the Pueblo Indians had the same unrestricted ability to alienate their lands as non-Indians whose titles originated in Spanish grants. This was confirmed by judicial decisions in the territorial courts of New Mexico and the Supreme Court's holding in *United States v. Joseph*, 94 U.S. 614, 24 L.Ed. 295 (1877).

Because of their "advanced development" and previous history as Mexican citizens, the *Joseph* court held that the Pueblo Indians of New Mexico were not "Indian tribes" within the meaning of the Nonintercourse Act and thus were not protected by that Act's restraints on the alienation of land belonging to Indian tribes. As a result of this holding, several thousand non-Indians acquired putative ownership to parcels of land located within the boundaries of the Pueblo land grants.

The status of these individuals' titles was thrown into doubt in 1913 by a Supreme Court decision which repudiated the notion that Pueblo Indians were not subject to federal laws. In *United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), the Supreme Court rejected the factual premise which had supported its holding in *Joseph* and found that the dependent status of the Pueblo Indians was such that Congress could prohibit the introduction of intoxicating liquors into Pueblo lands.[4]

It was not until 1926 that the Supreme Court expressly held that the Noninter-

course Act applied to the Pueblo Indians. *See United States v. Candelaria*, 271 U.S. 432, 441–442, 46 S.Ct. 561, 562–563, 70 L.Ed. 1023 (1926). But Congress did not wait for the Supreme Court to so hold. Instead, it responded to the turmoil created by the implications of the *Joseph* decision by passing legislation designed to finally settle the complicated title questions involving Pueblo land. This legislation was the Pueblo Lands Act (PLA). It was signed into law in 1924 and controls the outcome of this lawsuit. See Pueblo Lands Act of June 7, 1924, 43 Stat. 636, as amended by Act of May 31, 1933, 48 Stat. 111, (25 U.S.C.A. § 331, note), reprinted as Appendix A to this opinion.

### B. The Pueblo Lands Act

As noted by the Tenth Circuit and the Supreme Court[5], the PLA established a Pueblo Lands Board (Board) to examine non-Indian claims to Pueblo lands. Under the Act, the Board could extinguish title to Indian lands only if the non-Indian claimants had "[c]ontinuous, open, and notorious adverse possession ... coupled with the payment of taxes from 1889 to the date of enactment [of the PLA] in 1924, or from 1902 to 1924 if possession was under color of title." *Mountain States Tel. & Tel. Co. v. Santa Ana*, 472 U.S. 237, 244, 105 S.Ct. 2587, 2592, (quoting § 2, 43 Stat. 636). Under § 2 of the PLA, it was the duty of the Board to submit a report which determined which lands within the original Pueblo land grant still belonged to the Pueblos. The Board's § 2 report then became the basis for a quiet title action brought by the United States in federal district court to quiet title in the remaining land to the Pueblo. §§ 1, 3. Even if the Board did not accept the non-Indian claimants' adverse possession defense, these claimants had another

---

3. The Supreme Court stated that New Mexico was granted statehood in 1910. *See Mountain States Tel. & Tel. Co. v. Santa Ana*, 472 U.S. 237, 240, 105 S.Ct. 2587, 2590, 86 L.Ed.2d 168 (1985). In fact, it was not until 1912 that New Mexico was officially granted statehood.

4. The preceding three paragraphs paraphrase the Supreme Court's history of the effect of

American sovereignty on the Pueblo Indians' rights to alienate their lands. *See Mountain States*, 472 U.S. at 240–244, 105 S.Ct. at 2589–2592.

5. See *United States v. Trujillo*, 853 F.2d 800 (10th Cir.1988) and *Mountain States Tel. & Tel. Co. v. Santa Ana*, 472 U.S. 237, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985).

bite at the apple—they could again raise the § 4 adverse possession defense before the district court in the quiet title action. If the district court found that the § 4 adverse possession criteria had been met, Indian title to that land would be extinguished.

If land originally included in a Pueblo's grant was not included in the Board's § 2 report, it was presumed that the Board had unanimously determined that the Indian title to such land had been extinguished. Title to these lands did not vest in the non-Indian claimants until the Secretary of the Interior had filed field notes and plats for each pueblo showing the lands "to which Indian title ha[d] been extinguished." § 13. The Secretary could not file such notes and plats until at least two years had passed from the issuance of the Board's § 2 report.[6] § 13.

At issue in this case is the Board's § 2 report on the Pueblo of Santo Domingo. It stated that the Board

> having investigated the lands within the exterior boundaries of the land ... confirmed to the Pueblo of Santo Domingo as shown on blue print map hereto attached and marked "Exhibit A", being a Spanish Grant as confirmed by the Act of Congress approved December 1, 1858, and patented November 1, 1864, the exterior boundaries of said grant having been corrected by a resurvey made in 1907, has determined, and hereby determines, *that title thereto in said Pueblo has not been extinguished* in accordance with the provisions of said Act on June 7, 1924, as to the lands described and set forth by metes and bounds as follows, except certain tracts marked "Exceptions 1 to 36", inclusive, and indicated on the blue print map hereto attached and marked "Exhibit B", and *except the lands over-lapped by the La Majada, Sitio de Juana Lopez and Mesita de Juana Lopez grants shown on blue print map hereto attached and marked "Exhibit A"*, ...

Pueblo Lands Board, Santo Domingo Pueblo, Report on Title to Lands Granted or Confirmed to Pueblo Indians Not Extinguished (Report No. 1.) (December 29, 1927), Defendants' Ex. E–1 in Support of Their Motion for Summary Judgment (emphasis added).

Defendants argue that this language extinguished the Pueblo's title to the overlap land which is the subject of this lawsuit and that the legal challenge to the Board's finding that the plaintiffs now bring is barred by the statute of limitations provision of §§ 4 and 13 of the PLA. Defendants also advance several alternative theories. None of these need be addressed by the Court as it finds as a matter of law that the claim plaintiffs now bring is one encompassed by the independent suit provision of § 4 of the PLA, upon which the statute of limitations has run. Before explaining its holding, the Court will address defendants' Joint Motion in Limine or Alternatively, Motion to Strike.

## II.   Motion in Limine

■ Defendants ask this Court to strike the affidavits of plaintiffs' expert historical witnesses. The only affidavit relevant to this court's holding is that of Lawrence C. Kelly. Accordingly, defendants' motion will be considered only as it extends to Mr. Kelly's affidavit and supporting documents.

Defendants' principal argument is that the affidavit violates Fed.R.Evid. 702 and 703 because it is unreasonable for Mr. Kelly to rely on the inadmissible information in the documents which support his opinions. The defendants unwisely rely on *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 505 F.Supp. 1125 (E.D.Pa.1980) in arguing that it is for the Court, not the expert, to determine whether the material relied upon by the proffered expert is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject...." Fed.R. Evid. 703. Almost six months prior to the

---

**6.** The plats and field notes for the Pueblo of Santo Domingo were based on the Board's § 2 report and the quiet title action in *United States v. Montoya,* No. 1830 Equity, D.N.M., April 25, 1929. They were filed in 1930. See Defendants' Exhibits E–8 to E–12 in Support of Their Motion for Summary Judgment.

filing of defendants' Memorandum in Support of its Motion In Limine, the district court in *Zenith* was reversed on precisely the issue highlighted by defendants. *See In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 275–284 (3rd Cir.1983), *rev'd. on other grounds sub nom. Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *In re Japanese Electronic Products Antitrust Litigation* was cited with approval in *Marsee v. United States Tobacco Co.,* 866 F.2d 319 (10th Cir.1989). *See also Ponder v. Warren Tool Corp.,* 834 F.2d 1553, 1556–57 (10th Cir.1987).

The defendants also argue that Mr. Kelly's affidavit should be stricken because it goes to the ultimate issues. One need only read Fed.R.Evid. 704 to dismiss this argument. Moreover, the Court can admit opinion testimony of experts if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R. Evid. 702. In a case as historically complex as the one presently before it, the Court is at a loss to see how an adequate decision could be reached without expert historical testimony.

Finally, defendants argue that Mr. Kelly's affidavit should be stricken because it is contrary to Fed.R.Evid. 1006, 1002, 802 and Fed.R.Civ.P. 56(e). The Court finds that these arguments are without merit. Accordingly, the defendants' Joint Motion In Limine will be denied, and the Court will consider the affidavit of Mr. Kelly and supporting documents.

### III. Summary Judgment and the Pueblo Lands Act

A motion for summary judgment can only be granted when the record discloses that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In addition to cross-motions for summary judgment, the parties have stipulated to the material facts which are not in dispute. *See* Stipulation of the Parties as to Material Facts Not in Dispute,

filed June 24, 1988. It is on the basis of these stipulated facts that the Court holds in favor of the defendants on their summary judgment motion.

### A. Application of the PLA to the Facts Before the Court

As noted above, the parties' fundamental dispute concerns the meaning and effect of the language in the Board's § 2 report which purports to extinguish the Pueblo of Santo Domingo's title to all land overlapped by the Mesita de Juana Lopez Land Grant. The parties agree that there is no documentation to refute the conclusion that no claims pursuant to the adverse possession criteria of § 4 were ever presented to the Board by or on behalf of non-Indian claimants to the overlap lands. Stipulation, p. 4, para. no. 3.

Thus, the Court is faced with a situation where the Board allegedly extinguished title to approximately 24,000 acres of overlap land without having followed the PLA's mandate that title to Indian lands only be extinguished when non-Indian claimants satisfied the specific adverse possession criteria of § 4. In order to determine whether or not the Board's action can today bind the plaintiffs, the Court must engage in a thorough analysis of the PLA.

Although an analysis of any statute begins with the language of the statute, *Wilson v. Stocker,* 819 F.2d 943 (10th Cir. 1987), the Court may look beyond the words of the statute to ascertain its purpose if the statute contains an ambiguity, *Ewing v. Rodgers,* 826 F.2d 967 (10th Cir. 1987), and draw inferences from the congressional record if the statute leaves open a question of legislative intent. *Jones v. Intermountain Power Project,* 794 F.2d 546 (10th Cir.1986). It is the Court's duty to " 'find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.' " *Comm'r. v. Engle,* 464 U.S. 206, 217, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (quoting *NLRB v. Lion Oil Co.,* 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957)).

More specifically, the PLA should be interpreted so that all its sections are operative and each section is harmonized with the structure of the entire act and its contemporary legal context. *Mountain States,* 472 U.S. at 249, 252, 105 S.Ct. at 2594, 2596.[7]

The Court finds that the PLA contains ambiguous terms and that it leaves open questions of legislative intent. The most obvious, relevant ambiguity is found in the independent suit provision of § 4. It gave the Pueblo Indians at least two years to "assert and maintain *unaffected by the provisions of this Act* their title and right to any land by original proceedings, either in law or equity, in any court of competent jurisdiction." § 4 (emphasis added). The meaning of the underlined phrase, which is determinative of the outcome of this case, cannot be determined from the plain language of the statute. Without resort to the legislative history, this phrase is susceptible to the meanings ascribed it both by plaintiffs and by defendants. This ambiguity is more pronounced given the language of § 14 of the PLA. Section 14 was Congress' attempt to settle title to grant overlap lands. To resolve the ambiguities inherent in the statute, the Court will now look to the legislative history of the Pueblo Lands Act.

**B. Legislative History of the PLA and Section 14**

■ The PLA went through several forms before it was finally passed. The first bill put forth in the Senate in the summer of 1922 was the Bursam Bill. Plaintiffs' Ex. LCK 2, p. 8, *et seq.* and S. 3855, 67th Cong., 2nd Sess. (1922). It strongly favored settling title to disputed Indian lands in the non-Indians. For example, it proposed that all non-Indians who could demonstrate possession of their land prior to June 20, 1900 were to be granted title; that all holders of land under Spanish and Mexican land grants which overlapped with Pueblo land were to be awarded the entire overlap; and that the federal court was to have jurisdiction over all questions involving "internal affairs or the government" of the Pueblos. Once word of the Bursam bill reached New Mexico, non-Indian advocates for the Pueblos began to organize opposition. Plaintiffs' Ex. LCK 2, p. 9.

By January 1923, a rival Senate bill had been prepared which was referred to as the "Jones–Leatherwood Bill." The Jones–Leatherwood Bill differed substantially in that it provided for a distinct Court of Pueblo Land Claims which would have had "broad discretionary authority to arbitrate and confirm non-Indian claims." Plaintiffs' Ex. LCK 2, p. 11. *See also* S. 4223, 67th Cong., 4th Sess. (1922). Section 9 of this bill contained a provision which settled Mexican and Spanish land grant disputes in favor of the Indians. Under this section, the non-Indian grant claimants would suffer the loss and only non-Indian claimants whose title had previously been confirmed by Congress would be entitled to compensation. S. 4223, 67th Cong., 4th Sess., § 9 (1922).

It is self-evident that the Bursam and Jones–Leatherwood bills were at the opposite ends of the spectrum—one applied legal rules, albeit with harsh results for the Indians, and one was almost totally discretionary, which could have led to more favorable results for the Indians.

A third bill was also proposed. The Snyder Bill, submitted on December 16, 1922 in

---

**7.** Plaintiffs argue that this Court must construe ambiguous statutory language in favor of Indian claimants. This approach was rejected by the Supreme Court in *Mountain States Tel. & Tel. Co. v. Santa Ana,* 472 U.S. 237, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985), which applied standard canons of statutory construction to the PLA. The majority did not agree with the dissent's statement that "[a]mbiguous language in Indian statutes ... always has been construed in favor of restrictions on alienation." *Mountain States,* 472 U.S. at 276, 105 S.Ct. at 2608. This Court will follow the analysis of the majority, not the dissent. Applying standard canons of statutory construction to the PLA is also consistent with a recent Tenth Circuit opinion. In *Absentee Shawnee Tribe of Indians of Oklahoma v. State,* 862 F.2d 1415 (10th Cir.1988) the court stated: "The difference between interpreting a treaty and an act of Congress [in the context of property disputes involving Indian lands] is important. When interpreting a statute, Congress' intent as expressed in the statute is determinative." *Id.,* at 1417.

the House of Representatives, tracked the first six sections of the Bursam Bill but contained a new seventh section. Plaintiffs' Ex. LCK 2, p. 16. Section 7 of the Snyder bill was a response to claims that the Bursam Bill was confiscatory of Indian lands. *Id.* Its language gave all overlap lands to the Pueblo, even those that had been patented by the United States in favor of non-Indian claimants. *See* H.R. 13452, 67th Cong., 4th Sess. (1922).

Hearings were held in the Senate and the House in January 1923. Pueblo advocates were quite critical of the Bursam bill's handling of the grant overlap issue, but the overlap provisions of the Jones–Leatherwood Bill were not directly discussed. Plaintiffs' Ex. LCK 2, pps. 19, 25.

In the House, the Snyder Bill, "purged of its most onerous terms," Plaintiffs' Ex. 2, p. 28, was before the committee as was the Jones–Leatherwood Bill. In discussing the overlap provisions of the bill, the committee members seemed to agree that the Indians should retain title to lands which were the subject of grant overlaps unless the non-Indian claimants under the grant had better title. *See, e.g.,* H.R. 13452 and H.R. 1367, 67th Cong., 4th Sess., 258–259 (1922) where one Congressman states:

> I doubt very much whether anybody on this committee would for a minute consider any legislation which would authorize the validity of these Spanish grants to non-Indians where they overlap Pueblo territory unless the grant antedated the grant to the Indians. So I do not think we are particularly concerned with any cases except those where the evidence would show that the grant to the non-Indians was of an earlier date than the grant to the Indians.

The chairman of the House committee considering the bill seems to agree when he states "I want to say that there is nothing in the Snyder bill which would permit that to be done." *Id.* It is also important to note that both Senate and House committees evidenced "vigorous and overwhelming sentiment favoring a fixed rule of law over a flexible, discretionary approach to the title disputes." Plaintiffs' Ex. LCK 2, p. 39. They also agreed that there must be a statute of limitations for past adverse possession of Pueblo lands. *Id.*

After hundreds of pages of testimony and discussion, *see, e.g.* H.R. 13452 and H.R. 13674, 67th Cong., 4th Sess. (1922), the PLA as we now know it was passed. The 1923 hearings were the only ones held by Congress prior to the passage of the PLA in 1924. Section 14 of the PLA, which codified Congress' approach to grant overlap lands, states in relevant part that:

> [i]f any non-Indian party to any such suit shall assert against the Indian title a claim based upon a Spanish or Mexican grant, and if the court should finally find that such claim by the non-Indian is superior to that of the Indian claim, no final decree or judgment of ouster of the said Indians shall be entered or writ of possession or assistance shall be allowed against said Indians, or any of them, against the United States of America acting in their behalf.

The remainder of the provision provides that Congress would consider compensation for the non-Indians who held superior claims to Spanish or Mexican grant overlap lands. Thus, the plain language of the statute coupled with the legislative history indicate that Congress intended that the Pueblo Indians retain title to all overlap lands, even when the non-Indian claimants under the grants had superior title.

Given the above conclusion, the Court must determine whether the Pueblo had a statutory duty to challenge the alleged extinguishment of its right to the MDJL overlap prior to the filing of this suit in 1984. This determination cannot be made without analyzing the interplay between § 14 and §§ 2, 4 and 13 of the PLA.

C. Section 4 of the PLA

1. Independent Suit Provision

■ Section 4 states that "all persons claiming title to, or ownership of any lands involved in any such suit, or suits, may in addition to any other legal or equitable defenses which they may have or have had ..., plead limitation of action" based on adverse possession criteria. Section 4 lists

the adverse possession criteria, the details of which are not relevant to the Court's decision because there is no indication that any non-Indian MDJL claimants brought adverse possession claims before the Board.

Section 4 also contains what the parties refer to as the independent suit provision. This portion of § 4, in combination with § 13, gives the Pueblos at least two years from the filing of the Board's § 2 report in which to "assert and maintain unaffected by the provisions of this Act their title and right to any land by original proceedings, either in law or equity, in any court of competent jurisdiction...." § 4.

Plaintiffs claim they are not bringing a suit under § 4, which they concede would be barred.[8] They argue that the limitations provision in § 13 of the Act establishes a "point after which a conclusive defense arises on behalf of those who met the 1924 Act's criteria," *not* a limitation on the time for filing actions to assert title.[9] Under this theory, a defendant under the independent suit provision of § 4 could only be a non-Indian claimant who had met the Act's adverse possession criteria by a specific finding by the Board or by the district court in a quiet title action, *and* the filing of plats and field notes by the Attorney General. That defendant would then have a valid defense to such a suit.

This approach is consistent with Congress' specific concern that the Act secure title for non-Indian claimants who met the § 4 adverse possession criteria, though it is not reconcilable with the legislative history of the PLA or with common sense. The legislative history clearly states Congress' concern that the Act include a statute of limitations. Plaintiffs' Ex. LCK 2, p. 39. The main concern of the senators and representatives who opposed the liberal bills put forth by Pueblo advocates was that they contained no statute of limitations, not

that such bills did not give non-Indian claimants a conclusive defense to future actions brought by the Pueblos.

This distinction may seem one of semantics, but it is important. Plaintiffs argue that the purposes of the Act would be frustrated if the court read the provisions of §§ 4 and 13 as a statute of limitations, which "would have afforded settlers only pleas in abatement, not conclusive defenses on the merits of the title ..." as "limitations periods extinguish remedies, not substantive rights."[10] Even accepting plaintiffs' distinction, a statutory provision which extinguishes the Pueblos' remedies has the same effect as a provision which would give the settlers a substantive right to show they had title to the lands at issue pursuant to the PLA.

Under plaintiffs' theory, the Pueblos would have the opportunity to bring suits in which the burden would be on the successful non-Indian claimants under the PLA to show they held valid title by virtue of the § 4 adverse possession criteria. By contrast, under the statute of limitations theory advanced by defendants, a Pueblo has at least two years to bring its challenge to the Board's actions through a § 4 independent suit. If it does not bring such a suit before the Attorney General files the plats and field notes pursuant to § 13, it is barred. Only under defendants' theory is Congress' intention "to provide for the *final adjudication and settlement* of a very complicated and difficult series of conflicting titles affecting lands claimed by the Pueblo Indians of New Mexico" honored. *Mountain States,* 472 U.S. at 240, 105 S.Ct. at 2589–2590, quoting S.Rep. No. 492, 68th Cong., 1st Sess., 3 (1924) (emphasis added) (footnote omitted). Accordingly, the Court finds that the provisions of §§ 4 and 13 should be read as a statute of limitations, not merely as a defense to future claims brought by or on behalf of the

---

8. See Plaintiffs' Memorandum in Support of Cross–Motion for Summary Judgment, pps. 88–93.

9. *Id.* at 89.

10. Plaintiffs' Brief in Support of Cross–Motion for Summary Judgment, p. 89 (citations omitted).

Pueblos.[11]

This holding presumes that the independent suit provision of § 4 contemplates actions which challenge the validity of the findings of extinguishment in the Board's § 2 reports and that the limitations provision bars suits by the United States on behalf of the Pueblo, as well as those brought by the Pueblo itself.

2. Scope of the Independent Suit Provision

■ Plaintiffs argue that the independent suits authorized by § 4 "were not challenges to the Board's factual determinations on the merits of the private claims" but that they "simply permitted the Pueblo a last opportunity to sue as if the Act had never been passed."[12] They also argue that "[t]he Act in fact afforded no opportunity for any review of the Board's decisions on their merits, except as to the compensation awards under § 6."[13] This argument is based on that portion of § 4 which states that the Pueblo Indians' right to "assert and maintain *unaffected by the provisions of this Act* their title and right to any land by original proceedings...." shall not be impaired or destroyed. (Emphasis added.)

The Court cannot accept plaintiffs' position that under the Act, the Pueblo Indians had no mechanism for challenging the Board's § 2 findings that title to Indian lands had been extinguished. This claim seems particularly strange in light of legislative history indicating that the final draft of what became the PLA was designed to protect the titles of the Pueblo Indians. H.R. 787, 68th Cong., 1st Sess., 9 (1924).

Moreover, and perhaps most importantly, a logical reading of the plain language of the statute indicates that the independent suit provision of § 4 provided for the bringing of suits to challenge the Board's findings. The phrase "unaffected by the provisions of this Act" is logically read as *allowing* the Pueblo to bring suits which challenged the findings of the Board. For example, the Board's § 2 report was filed pursuant to the provisions of the Act. Since independent suits could be brought "unaffected by the provisions of the Act," the Pueblo could, under § 4, bring suits challenging the validity of the Board's § 2 findings of extinguishment.

While §§ 4 and 13 are to be construed as a statute of limitations, it is important to note that the Act and its legislative history give no indication that Congress ever directly contemplated that the Board would attempt to extinguish title to Pueblo lands without first finding that the adverse possession criteria of § 4 had been met. However, Congress did provide the Pueblos a mechanism for challenging any findings of the Board. This mechanism, as discussed above, was the independent suit provision of § 4.

■ The Plaintiffs argue that:

... the legal ineffectiveness of the Board's lone statement about the overlap is not remedied by the failure of someone to do something about it. If an act is void, it is void, and the very fact of its invalidity means that no action is required to make it more void.[14]

11. In *Santa Ana v. Baca,* 844 F.2d 708 (10th Cir.1988), the court stated in a footnote that the PLA was

intended only to oblige non-Indians to prove claims to Pueblo lands; Pueblos could only file suit in response to claims made against them by non-Indians ... Furthermore, Santa Ana had no reason to file suit under § 4 of the Act because no claim was made against it concerning the disputed land. Santa Ana had no notice that its rights to the disputed parcel were jeopardized by non-Indian claims.

*Id.* at n. 1. The important distinction between the case at bar and *Santa Ana* concerns notice. Although no claims by non-Indian claimants to MDJL lands were filed before the Board, the

Pueblo did have notice that the Board was attempting to extinguish title to the overlap land. Notice was evident in the Board's § 2 report; the § 3 quiet title action, the complaint to which was based on the Board's § 2 report; and the Board's § 6 report which listed the Pueblo's acreage as tens of thousands of acres less than it would have been had the overlap acreage been included.

12. Plaintiffs' Memo in Support of Cross–Motion for Summary Judgment, p. 85.

13. *Id.* at 84–85.

14. Plaintiffs' Reply Brief at 9.

Plaintiffs cite no law to support this unconvincing proposition. The Court recognizes that it may have been a daunting task to challenge the Board's findings since its meetings were closed and no explanation was given for its findings. Plaintiffs' Ex. LCK 2, p. 60. However, once the Board made a finding of extinguishment, that land was brought within the provisions of the PLA and the statute of limitations, in accordance with the provisions of §§ 4 and 13, began to run against the Pueblo. This analysis of the PLA is consistent with previous decisions in this district. *See, e.g. Pueblo of Santa Domingo v. Atchison, Topeka and Santa Fe Ry.,* CIV No. 83–1889 HB (D.N.M. Aug. 26, 1985). It is also the analysis most consistent with Congress' intent to pass legislation which would "provide for the *final* adjudication and settlement of a very complicated and difficult series of conflicting titles affecting lands claimed by the Pueblo Indians of New Mexico." H.R. 787, 68th Cong., 1st Sess., 2 (9124) (emphasis added).

3. Effect of provision on the United States

Plaintiffs claim that even if § 4 of the 1924 Act bars the Pueblo from bringing this suit, the United States can bring this suit on the Pueblos' behalf. Defendants argue that because the United States disclaimed any interest in the MDJL lands, it cannot now bring an action for MDJL lands on the Pueblo's behalf. The real question is whether the PLA, which refers in §§ 4 and 13 only to the Pueblos, binds the United States as trustee for the Pueblos.

Plaintiffs argue that *United States v. Candelaria,* 271 U.S. 432, 46 S.Ct. 561, 70 L.Ed. 1023 (1926), is on all fours with the case at bar. The Court finds otherwise. In *Candelaria,* the Supreme Court held that Pueblos were "Indian tribes" within the meaning of the Nonintercourse Act. 271 U.S. at 441–442, 46 S.Ct. at 562–563. Judgments against the Pueblo of Laguna did not bind the United States because

"[t]he Indians of the Pueblo are wards of the United States and hold their lands subject to the restriction that the same cannot be alienated in any-wise without

its consent. A judgment or decree which operates directly or indirectly to transfer the lands from the Indians, where the United States has not authorized or appeared in the suit, infringes that restriction."

*Id.* at 443, 46 S.Ct. at 563. The *Candelaria* Court was concerned with transactions which occurred *prior* to the passage of the PLA and which were governed exclusively by the Nonintercourse Act. The events under consideration in the case at bar are governed by the PLA, which was passed in an attempt to settle complicated questions of title which resulted from the confusion created in 1913 when the Supreme Court implied that the Nonintercourse Act might apply to the Pueblos. *Mountain States,* 472 U.S. at 242–243, 105 S.Ct. at 2591, *United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913).

In view of the caselaw and the history of the PLA, it would be absurd for Congress to pass a statute which did not encompass the United States' trust duty to the Indians. It would hardly settle title to the lands of non-Indian claimants if the United States could bring actions on behalf of the Pueblo once the statute of limitations had run on the Pueblos. Moreover, § 5 of the PLA strongly suggests that the limitations period runs against the United States, as well as the Pueblo. Section 5 states:

The plea of limitations, successfully maintained, shall entitle the claimants so pleading to a decree in favor of them ... which shall have the effect of a deed of quitclaim as against the United States and said Indians, *and a decree in favor of claimants upon any other ground shall have a like effect.*

(Emphasis added.) The latter portion of this section suggests that Congress intended any favorable decree for non-Indian claimants to bind the United States, as well as the Indians. Since this case involves a § 2 report issued by the Board, not a "decree," which suggests a court order, the section is not directly on point. It is, however, evidence that Congress did not intend for the United States to escape the effect of actions brought by the Pueblos. For

example, had the Indians brought an independent suit as authorized by § 4, the suit would have been brought in federal district court. Under the terms of § 5, an adverse ruling for the Pueblo in such a suit would have had the effect of a quitclaim deed against the United States, as well as the Indians.

### D. Interplay between Sections 3, 4 and 14

The Court has determined that the Board's extinguishment of title to overlap lands, though not done in compliance with the § 4 adverse possession requirements, brought that land within the provisions of the PLA. The Court has also determined that §§ 4 and 13 operate as a statute of limitations against the Pueblo. The Court must now reconcile those determinations with its finding that Congress, through § 14, intended that Pueblo Indians retain title to all overlap lands.

At first glance, Congress seems to have limited the effect of § 14 to § 3 quiet title suits in which the defendants claimed superior title under Mexican or Spanish land grants. Nothing in § 14 indicates that it was meant to bind the Board. The language of § 14 refers to "any such suit" and makes repeated references to "the court."

At first blush, it may seem contradictory to suggest that the Board could randomly extinguish title to approximately 24,000 acres of overlap land in a § 2 report when, under a § 3 quiet title action, non-Indian settlers would lose overlap land to the Indians, even if they held superior title. But this contradiction dissolves when the statute is viewed as a whole. Had the Pueblo brought a timely independent suit under § 4 and successfully challenged the Board's extinguishment to the overlap, that land would have become part of the § 3 quiet title action. Had the defendants in the quiet title action raised the issue of superior possession under the MDJL, § 14 would have kicked in and title to the overlap lands would have remained in the Pueblo.

### IV. Conclusion

Based on the above analysis, the Court concludes that suit now brought by plaintiffs is one which was encompassed by the independent suit provision of § 4 of the Pueblo Lands Act and that the statute of limitations on such a suit, as conceded by plaintiffs,[15] has long since run. Having so held, it is unnecessary for the Court to consider any of the additional arguments advanced by defendants.

An order in accordance with this opinion will be entered of even date.

---

**15.** See Plaintiffs' Memorandum in Support of Cross–Motion for Summary Judgment, pps. 88–93. Plaintiffs conceded that the statute of limi-tations had run on § 4 independent suits but argued that theirs was not such a suit. This Court has found otherwise.

# APPENDIX A

## Pueblo Lands Act of 1924
## 43 Stat. 636

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That in order to quiet title to various lots, parcels, and tracts of land in the State of New Mexico for which claim shall be made by or on behalf of the Pueblo Indians of said State as hereinafter provided, the United States of America, in its sovereign capacity as guardian of said Pueblo Indians shall, by its Attorney General, file in the District Court of the United States for the District of New Mexico, its bill or bills of complaint with a prayer for discovery of the nature of any claim or claims of any kind whatsoever adverse to the claim of said Pueblo Indians, as hereinafter determined.

SEC. 2. That there shall be, and hereby is, established a board to be known as "Pueblo Lands Board" to consist of the Secretary of the Interior, the Attorney General, each of whom may act through an assistant in all hearings, investigations, and deliberations in New Mexico, and a third member to be appointed by the President of the United States. The board shall be provided with suitable quarters in the city of Santa Fe, New Mexico, and shall have power to require the presence of witnesses and the production of documents by subpœna, to employ a clerk who shall be empowered to administer oaths and take acknowledgments, shall employ such clerical assistance, interpreters, and stenographers with such compensation as the Attorney General shall deem adequate, and it shall be provided with such necessary supplies and equipment as it may require on requisitions to the Department of Justice. The compensation and allowance for travel and expenses of the member appointed by the President shall be fixed by the Attorney General.

It shall be the duty of said board to investigate, determine, and report and set forth by metes and bounds, illustrated where necessary by field notes and plats, the lands within the exterior boundaries of any land granted or confirmed to the Pueblo Indians of New Mexico by any authority of the United States of America, or any prior sovereignty, or acquired by said Indians as a community by purchase or otherwise, title to which the said board shall find not to have been extinguished in accordance with the provisions of this Act, and the board shall not include in their report any claims of non-Indian claimants who, in the opinion of said board after investigation, hold and occupy such claims of which they have had adverse possession, in accordance with the provisions of section 4 of this Act: *Provided, however,* That the board shall be unanimous in all decisions whereby it shall be determined that the Indian title has been extinguished.

The board shall report upon each pueblo as a separate unit and upon the completion of each report one copy shall be filed with the United States District Court for the District of New Mexico, one with the Attorney General of the United States, one with the Secretary of the Interior, and one with the Board of Indian Commissioners.

SEC. 3. That upon the filing of each report by the said board, the Attorney General shall forthwith cause to be filed in the United States District Court for the District of New Mexico, as provided

Pueblo Indian land grants, N. Mex.
Suit on behalf of Pueblo Indians to be filed in district court to quiet titles to lands within.

Pueblo Lands Board, established.
Composition.

Quarters, powers, personnel, etc.

Pay, etc., of appointive members.
*Post,* p. 1028.

To investigate, determine, etc., the lands of which the Indian title has not been extinguished.

Claims by adverse possession of non-Indians, excluded.

*Proviso.*
Decisions as to extinguishment of Indian title.

Report on each pueblo to be filed with court, etc.

Suit to quiet title on filing of report.

**1219**

SIXTY-EIGHTH CONGRESS. Sess. I. Ch. 331. 1924. .637

in section 1 of this Act, a suit to quiet title to the lands described in said report as Indian lands the Indian title to which is determined by said report not to have been extinguished.

Sec. 4. That all persons claiming title to, or ownership of any lands involved in any such suit, or suits, may in addition to any other legal or equitable defenses which they may have or have had under the laws of the Territory and State of New Mexico, plead limitation of action, as follows, to wit: <span style="float:right">*Pleas of limitation by adverse claimants.*</span>

(a) That in themselves, their ancestors, grantors, privies, or predecessors in interest or claim of interest, they have had open, notorious, actual, exclusive, continuous, adverse possession of the premises claimed, under color of title from the 6th day of January, 1902, to the date of the passage of this Act, and have paid the taxes lawfully assessed and levied thereon to the extent required by the statutes of limitation, or adverse possession of the Territory or of the State of New Mexico, since the 6th day of January, 1902, to the date of the passage of this Act, except where the claimant was exempted or entitled to be exempted from such tax payment. <span style="float:right">*Actual adverse possession under color of title, since January 6, 1902.*<br>*Taxes paid, etc.*</span>

(b) That in themselves, their ancestors, grantors, privies, or predecessors in interest or claim of interest, they have had open, notorious, actual, exclusive, continuous, adverse possession of the premises claimed with claim of ownership, but without color of title from the 16th day of March, 1889, to the date of the passage of this Act, and have paid the taxes lawfully assessed and levied thereon to the extent required by the statutes of limitation or adverse possession of the Territory or of the State of New Mexico, from the 16th day of March, 1899, to the date of the passage of this Act, except where the claimant was exempted or entitled to be exempted from such tax payment. <span style="float:right">*Actual adverse possession without color of title, since March 16, 1889.*<br>*Taxes paid, etc.*</span>

Nothing in this Act contained shall be construed to impair or destroy any existing right of the Pueblo Indians of New Mexico to assert and maintain unaffected by the provisions of this Act their title and right to any land by original proceedings, either in law or equity, in any court of competent jurisdiction and any such right may be asserted at any time prior to the filing of the field notes and plats as provided in section 13 hereof, and jurisdiction with respect to any such original proceedings is hereby conferred upon the United States District Court for the District of New Mexico with right of review as in other cases: *Provided, however,* That any contract entered into with any attorney or attorneys by the Pueblo Indians of New Mexico, to carry on such litigation shall be subject to and in accordance with existing laws of the United States. <span style="float:right">*Right of Indians to assert right to title, etc., by original court proceedings prior to filing of field notes, etc., not impaired.*<br><br>*Post, p. 640.*<br>*Jurisdiction of court.*<br><br>*Proviso.*<br>*Condition on contracts with attorneys.*</span>

Sec. 5. The plea of such limitations, sucessfully maintained, shall entitle the claimants so pleading to a decree in favor of them, their heirs, executors, successors, and assigns for the premises so claimed by them, respectively, or so much thereof as may be established, which shall have the effect of a deed of quitclaim as against the United States and said Indians, and a decree in favor of claimants upon any other ground shall have a like effect. <span style="float:right">*Effect if plea of limitations maintained.*</span>

The United States may plead in favor of the pueblo, or any individual Indian thereof, as the case might be, the said limitations hereinbefore defined. <span style="float:right">*Authority of United States to plead.*</span>

Sec. 6. It shall be the further duty of the board to separately report in respect of each such pueblo— <span style="float:right">*Further reports.*</span>

(a) The area and character of any tract or tracts of land within the exterior boundaries of any land granted or confirmed to the Pueblo Indians of New Mexico and the extent, source, and character of any water right appurtenant thereto in possession of non-Indian claimants at the time of filing such report, which are not claimed for said Indians by any report of the board. <span style="float:right">*On area, etc., of land and water rights in possession of non-Indian claimants, etc.*</span>

Whether land or water rights recoverable by seasonable prosecution thereof.

(b) Whether or not such tract or tracts of land or such water rights could be or could have been at any time recovered for said Indians by the United States by seasonable prosecution of any right of the United States or of said Indians.  Seasonable prosecution is defined to mean prosecution by the United States within the same period of time as that within which suits to recover real property could have been brought under the limitation statutes of the Territory and State of New Mexico.

Meaning of seasonable prosecution.

Fair market value of water rights and land, if recoverable by seasonable prosecution, etc.

(c) The fair market value of said water rights and of said tract or tracts of land (exclusive of any improvements made therein or placed thereon by non-Indian claimants) whenever the board shall determine that such tract or tracts of land or such water rights could be or could have been at any time recovered for said Indians by the United States by seasonable prosecution of any right of the United States or of said Indians, and the amount of loss, if any, suffered by said Indians through failure of the United States seasonably to prosecute any such right.

Liability of United States, and award to pueblo.

The United States shall be liable, and the board shall award compensation, to the pueblo within the exterior boundaries of whose lands such tract or tracts of land shall be situated or to which such water rights shall have been appurtenant to the extent of any loss suffered by said Indians through failure of the United States seasonably to prosecute any right of the United States or of said Indians, subject to review as herein provided.  Such report and award shall have the force and effect of a judicial finding and final judgment upon the question and amount of compensation due to the Pueblo Indians from the United States for such losses.  Such report shall be filed simultaneously with and in like manner as the reports hereinbefore provided to be made and filed in section 2 of this Act.

Judicial effect of award, etc.

Reports to be filed simultaneously with the other.
*Ante*, p. 636.

Review by court on petition.

At any time within sixty days after the filing of said report with the United States District Court for the District of New Mexico as herein provided the United States or any pueblo or Indians concerned therein or affected thereby may, in respect of any report upon liability or of any finding of amount or award of compensation set forth in such report, petition said court for judicial review of said report, specifying the portions thereof in which review is desired.  Said court shall thereupon have jurisdiction to review, and shall review, such report, finding, or award in like manner as in the case of proceedings in equity.  In any such proceeding the report of the board shall be prima facie evidence of the facts, the values, and the liability therein set forth, subject, however, to be rebutted by competent evidence.  Any party in interest may offer evidence in support or in opposition to the findings in said report in any respect.  Said court shall after hearing render its decision so soon as practicable, confirming, modifying, or rejecting said report or any part thereof.  At any time within thirty days after such decision is rendered said court shall, upon petition of any party aggrieved, certify the portions of such report, review of which has been sought, together with the record in connection therewith, to the United States Circuit Court of Appeals for the Eighth Circuit, which shall have jurisdiction to consider, review, and decide all questions arising upon such report and record in like manner as in the case of appeals in equity, and its decision thereon shall be final.

Jurisdiction of court.

Procedure.

Review by circuit court of appeals on petition of aggrieved party.

Finality of decision.

Review of specific finding not to affect other findings, etc.

No awarding of costs.

Petition for review of any specific finding or award of compensation in any report shall not affect the finality of any findings nor delay the payment of any award set forth in such report, review of which shall not have been so sought, nor in any proceeding for review in any court under the provisions of this section shall costs be awarded against any party.

1221

SIXTY-EIGHTH CONGRESS. Sess. I. Ch. 331. 1924. 639

Sec. 7. It shall be the further duty of the board to investigate, ascertain, and report to the Secretary of the Interior who shall report to the Congress of the United States, together with his recommendation, the fair market value of lands, improvements appurtenant thereto, and water rights of non-Indian claimants who, in person or through their predecessors in title prior to January 6, 1912, in good faith and for a valuable consideration purchased and entered upon Indian lands under a claim of right based upon a deed or document purporting to convey title to the land claimed or upon a grant, or license from the governing body of a pueblo to said land, but fail to sustain such claim under the provisions of this Act, together with a statement of the loss in money value thereby suffered by such non-Indian claimants. Any lands lying within the exterior boundaries of the pueblo of Nambe land grant, which were conveyed to any holder or occupant thereof or his predecessor or predecessors in interest by the governing authorities of said pueblo, in writing, prior to January 6, 1912, shall unless found by said board to have been obtained through fraud or deception, be recognized as constituting valid claims by said board and by said courts, and disposed of in such manner as lands the Indian title to which has been determined to have been extinguished pursuant to the provisions of this Act: *Provided*, That nothing in this section contained with reference to the said Nambe Pueblo Indians shall be construed as depriving the said Indians of the right to impeach any such deed or conveyance for fraud or to have mistakes therein corrected through a suit in behalf of said pueblo or of an individual Indian under the provisions of this Act.

<span style="float:right">Investigation, recommendation, etc., directed on value of lands, etc., of non-Indians for purchase and entry under deed from pueblo authority, whose claims are not sustained.</span>

<span style="float:right">Recognition of claims within Nambe pueblo grant.</span>

<span style="float:right">Disposal of.</span>

<span style="float:right">*Proviso.* Right of Indians to impeach validity of deed.</span>

Sec. 8. It shall be the further duty of the board to investigate, ascertain, and report to the Secretary of the Interior the area and the value of the lands and improvements appurtenant thereto of non-Indian claimants within or adjacent to Pueblo Indian settlements or towns in New Mexico, title to which in such non-Indian claimants is valid and indefeasible, said report to include a finding as to the benefit to the Indians in anywise of the removal of such non-Indian claimants by purchase of their lands and improvements and the transfer of the same to the Indians, and the Secretary of the Interior shall report to Congress the facts with his recommendations in the premises.

<span style="float:right">Investigation, report, etc., on value of lands and improvements of non-Indian claimants with valid title, etc.</span>

Sec. 9. That all lands, the title to which is determined in said suit or suits, shall, where necessary, be surveyed and mapped under the direction of the Secretary of the Interior, at the expense of the United States, but such survey shall be subject to the approval of the judge of the United States District Court for the District of New Mexico, and if approved by said judge shall be filed in said court and become a part of the decree or decrees entered in said district court.

<span style="float:right">Survey, etc., of lands the title to which is determined.</span>

<span style="float:right">Subject to approval of judge, etc.</span>

Sec. 10. That necessary costs in all original proceedings under this Act, to be determined by the court, shall be taxed against the United States and any party aggrieved by any final judgment or decree shall have the right to a review thereof by appeal or writ of error or other process, as in other cases, but upon such appeal being taken each party shall pay his own costs.

<span style="float:right">Costs.</span>

Sec. 11. That in the sense in which used in this Act the word "purchase" shall be taken to mean the acquisition of community lands by the Indians other than by grant or donation from a sovereign.

<span style="float:right">Meaning of "purchase" as used herein.</span>

Sec. 12. That any person claiming any interest in the premises involved but not impleaded in any such action may be made a party defendant thereto or may intervene in such action, setting up his claim in usual form.

<span style="float:right">Intervening allowed of any party claiming an interest.</span>

640    SIXTY-EIGHTH CONGRESS.  Sess. I.  Ch. 331.  1924.

*Field notes and plats of all lands granted to Pueblo Indians, not claimed therefor in pending proceedings, etc., to be filed with surveyor general, two years after reports made by board.*

Sec. 13. That as to all lands within the exterior boundaries of any lands granted or confirmed to the Pueblo Indians of New Mexico, by any authority of the United States of America or any prior sovereignty, or acquired by said Indians as a community by purchase or otherwise and which have not been claimed for said Indians by court proceedings then pending or the findings and report of the board as herein provided, the Secretary of the Interior at any time after two years after the filing of said reports of the board shall file field notes and plat for each pueblo in the office of the surveyor general of New Mexico at Santa Fe, New Mexico, showing the lands to which the Indian title has been extinguished as in said report set out, but excluding therefrom lands claimed by or for the Indians in court proceedings then pending, and copies of said plat and field notes certified by the surveyor general of New Mexico as true and correct

*Acceptance conclusive as to title extinguished, etc.*

copies shall be accepted in any court as competent and conclusive evidence of the extinguishment of all the right, title, and interest of the Indians in and to the lands so described in said plat and field

*Publication, after expiration of right of Indians to bring independent suits, giving names of non-Indian claims for land holdings, etc, not claimed by Indians.*

notes and of any claim of the United States in or to the same.  And the Secretary of the Interior within thirty days after the Indians' right to bring independent suits under this Act shall have expired, shall cause notice to be published in some newspaper or newpapers of general circulation issued, if any there be, in the county wherein lie such lands claimed by non-Indian claimants, respectively, or wherein some part of such lands are situated, otherwise in some newspaper or newspapers of general circulation published nearest to such lands, once a week for five consecutive weeks, setting forth as nearly as may be the names of such non-Indian claimants of land holdings not claimed by or for the Indians as herein provided, with a description of such several holdings, as shown by a survey of Pueblo Indian lands heretofore made under the direction of the Secretary of the Interior and commonly known as the "Joy Survey," or as may be otherwise shown or defined by authority of the Secretary of the

*Adverse claimants required to file notice of contest in proper land office.*

Interior, and requiring that any person or persons claiming such described parcel or parcels of land or any part thereof, adversely to the apparent claimant or claimants so named as aforesaid, or their heirs or assigns, shall, on or before the thirtieth day after the last publication of such notice, file his or their adverse claim in the United States Land Office in the land district wherein such parcel or parcels of land are situate, in the nature of a contest, stating the character and basis of such adverse claim, and notice of such contest shall be served upon the claimant or claimants named in the said notice, in the same

*Patent to claimant if no contest instituted.*

manner as in cases of contest of homestead entries.  If no such contest is instituted as aforesaid, the Secretary of the Interior shall issue to the claimant or claimants, or their heirs or assigns, a patent or other certificate of title for the parcel or parcels of land so de-

*Hearings of contests.*

scribed in said notice; but if a contest be filed it shall proceed and be heard and decided as contests of homestead entries are heard and decided under the rules and regulations of the General Land Office

*Benefits allowed.*

pertinent thereto.  Upon such contest either party may claim the benefit of the provisions of section 4 of this Act to the same extent as if he were a party to a suit to quiet title brought under the provisions of this Act, and the successful party shall receive a patent or certificate of title for the land as to which he is successful in such proceeding.  Any patent or certificate of title issued under the provisions of this Act shall have the effect only of a relinquishment by the

*Procedure if two or more adverse claimants.*

United States of America and the said Indians.

If after such notice more than one person or group of persons united in interest makes claim in such land office adverse to the claimant or claimants named in the said notice, or to any other person or group of persons who may have filed such contest, each

1223

SIXTY-EIGHTH CONGRESS.  Sess. I.  Ch. 331.  1924.  641

contestant shall be required to set forth the basis and nature of his respective claim, and thereupon the said claims shall be heard and decided as upon an original contest or intervention.

And in all cases any person or persons whose right to a given parcel or parcels of land has become fixed either by the action of the said board or the said court or in such contest may apply to the Commissioner of the General Land Office for a patent or certificate of title and receive the same without cost or charge.

*Patents to be issued without cost.*

Sec. 14. That if any non-Indian party to any such suit shall assert against the Indian title a claim based upon a Spanish or Mexican grant, and if the court should finally find that such claim by the non-Indian is superior to that of the Indian claim, no final decree or judgment of ouster of the said Indians shall be entered or writ of possession or assistance shall be allowed against said Indians, or any of them, or against the United States of America acting in their behalf.  In such case the court shall ascertain the area and value of the land thus held by any non-Indian claimant under such superior title, excluding therefrom the area and value of lots or parcels of land the title to which has been found to be in other persons under the provisions of this Act: *Provided, however,* That any findings by the court under the provisions of this section may be reviewed on appeal or writ of error at the instance of any party aggrieved thereby, in the same manner, to the same extent, and with like effect as if such findings were a final judgment or decree.  When such finding adverse to the Indian claim has become final, the Secretary of the Interior shall report to Congress the facts, including the area and value of the land so adjudged against the Indian claim, with his recommendations in the premises.

*Action if Spanish or Mexican grant asserted by non-Indian party.*

*Ascertainment of value of land by court.*

*Proviso. Review or appeal allowed.*

*Report, etc., to Congress if final finding against Indian claim.*

Sec. 15. That when any claimant, other than the United States for said Indians not covered by the report provided for in section 7 of this Act, fails to sustain his claim to any parcel of land within any Pueblo Indian grant, purchase, or donation under the provisions of this Act, but has held and occupied any such parcel in good faith, claiming the same as his own, and the same has been improved, the value of the improvements upon the said parcel of land shall be found by the court and reported by the Secretary of the Interior to Congress, with his recommendations in the premises.

*Improvements by nonsuccessful claimant to be reported to Congress with recommendations.*

Sec. 16. That if any land adjudged by the court or said lands board against any claimant be situate among lands adjudicated or otherwise determined in favor of non-Indian claimants and apart from the main body of the Indian land, and the Secretary of the Interior deems it to be for the best interest of the Indians that such parcels so adjudged against the non-Indian claimant be sold, he may, with the consent of the governing authorities of the pueblo, order the sale thereof, under such regulations as he may make, to the highest bidder for cash, and if the buyer thereof be other than the losing claimant, the purchase price shall be used in paying to such losing claimant the adjudicated value of the improvements aforesaid, if found under the provisions of section 15 hereof, and the balance thereof, if any, shall be paid over to the proper officer, or officers, of the Indian community, but if the buyer be the losing claimant, and the value of his improvements has been adjudicated as aforesaid, such buyer shall be entitled to have credit upon his bid for the value of such improvements so adjudicated.

*Sale of lands adjacent to non-Indian claimants, and apart from Indian lands.*

*Use of proceeds.*

Sec. 17. No right, title, or interest in or to the lands of the Pueblo Indians of New Mexico to which their title has not been extinguished as hereinbefore determined shall hereafter be acquired or initiated by virtue of the laws of the State of New Mexico, or in any other manner except as may hereafter be provided by Congress, and no sale, grant, lease of any character, or other conveyance of lands,

*No right, etc., to be acquired to unextinguished Pueblo Indian lands, except as provided by Congress, etc.*

or any title or claim thereto, made by any pueblo as a community, or any Pueblo Indian living in a community of Pueblo Indians, in the State of New Mexico, shall be of any validity in law or in equity unless the same be first approved by the Secretary of the Interior.

*Federal court procedure, etc., applicable.*

Sec. 18. That the pleading, practice, procedure, and rules of evidence shall be the same in all causes arising under this Act as in other civil causes in the Federal courts, except as otherwise herein provided.

*Sums appropriated for Indians, etc., to be paid to Bureau of Indian Affairs for disbursement, etc.*

Sec. 19. That all sums of money which may hereafter be appropriated by the Congress of the United States for the purpose of paying in whole or in part any liability found or decreed under this Act from the United States to any pueblo or to any of the Indians of any pueblo, shall be paid over to the Bureau of Indian Affairs, which Bureau, under the direction of the Secretary of the Interior, shall use such moneys at such times and in such amounts as may seem wise and proper for the purpose of the purchase of lands and water rights to replace those which have been lost to said pueblo or to said Indians, or for purchase or construction of reservoirs, irrigation works, or the making of other permanent improvements upon, or for the benefit of lands held by said pueblo or said Indians.

Approved, June 7, 1924.